## AMERICAN POWER & LIGHT CO. *v.* SECURITIES & EXCHANGE COMMISSION.

NO. 4.

Argued November 16, 1945. Reargued October 14, 15, 1946.— Decided November 25, 1946.

94

*Arthur A. Ballantine* and *John F. MacLane* argued the cause for petitioner in No. 4 on the original argument,

and *Mr. Ballantine* on the reargument. With them on the briefs were *Frank A. Reid, Wilkie Bushby* and *Joseph Schreiber.*

*Daniel James* argued the cause for petitioner in No. 5. With him on the briefs were *John F. MacLane, Frank A. Reid* and *John W. Nields.*

*Roger S. Foster* argued the cause for respondent. With him on the brief were *Solicitor General McGrath, Paul A. Freund, Milton V. Freeman, Morton E. Yohalem* and *David Ferber.*

*Percival E. Jackson* filed a brief for the Holders of Preferred Stock of Electric Power & Light Corporation, as *amicus curiae,* urging affirmance.

Mr. Justice Murphy delivered the opinion of the Court.

We are concerned here with the constitutionality of § 11 (b) (2) of the Public Utility Holding Company Act of 1935 [1] and its application to the petitioners, the American Power & Light Company and the Electric Power & Light Corporation.

American and Electric are two of the subholding companies in the Electric Bond and Share Company holding company system, certain aspects of which were considered by this Court in *Electric Bond & Share Co.* v. *S. E. C.,* 303 U. S. 419. This system is a pyramid-like structure of which Bond and Share itself constitutes the apex, five subholding companies (including American and Electric) create an intermediate tier,[2] and approximately 237 direct

---

[1] 49 Stat. 803, 821; 15 U. S. C. § 79k (b) (2).

[2] The other three subholding companies are the American & Foreign Power Company, Inc., the National Power & Light Company and the American Gas & Electric Company. Bond and Share also has a

and indirect subsidiaries of the latter form the base. From the standpoint of book capitalization and assets, number of customers and areas served by the operating companies, and quantity of electricity generated and gas sold, the Bond and Share system constitutes the largest single public utility holding company system registered under the Act.

The proceeding now under review was instituted by the Securities and Exchange Commission under § 11 (b) (2) of the Act. After appropriate notice and hearing, the Commission found that the corporate structure and continued existence of American and Electric unduly and unnecessarily complicated the Bond and Share system and unfairly and inequitably distributed voting power among the security holders of that system, in violation of the standards of § 11 (b) (2). 11 S. E. C. 1146. Orders were accordingly entered requiring the dissolution of both American and Electric and requiring them to submit plans for the effectuation of these orders. The First Circuit Court of Appeals sustained the Commission's action in all respects and affirmed its orders, while refusing to consider certain contentions of American and Electric which had not been raised before the Commission. 141 F. 2d 606. We granted certiorari because of the obvious public importance of the issues presented. 325 U. S. 846.

I.

At the outset, we reject the claim that § 11 (b) (2), viewed from the standpoint of the commerce clause, is unconstitutional.

wholly-owned service subsidiary, Ebasco Services Incorporated. The organizational set-up is more fully explained in the Commission's opinion in this proceeding, 11 S. E. C. 1146, and in *In re Electric Bond & Share Co.*, 9 S. E. C. 978.

So far as here pertinent,[3] § 11 (b) (2) directs the Securities and Exchange Commission, as soon as practicable after January 1, 1938, "To require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such steps as the Commission shall find necessary to ensure that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system. . . . Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding company, or of any company whose principal business is that of a public-utility company."

Like § 11 (b) (1), its statutory companion, § 11 (b) (2) applies only to registered holding companies and their subsidiaries. We noted in *North American Co.* v. *S. E. C.,* 327 U. S. 686, 698, that by making certain interstate transactions unlawful unless a holding company registers with the Commission, § 4 (a), and by extending § 11 (b) (1) to registered holding companies, Congress has effectively applied § 11 (b) (1) to those holding companies that are

---

[3] The so-called "great-grandfather clause" of § 11 (b) (2) is not involved in this case. That provides that "In carrying out the provisions of this paragraph the Commission shall require each registered holding company (and any company in the same holding-company system with such holding company) to take such action as the Commission shall find necessary in order that such holding company shall cease to be a holding company with respect to each of its subsidiary companies which itself has a subsidiary company which is a holding company." See *Otis & Co.* v. *S. E. C.,* 323 U. S. 624.

in fact in the stream of interstate activity or that affect commerce in more states than one. The identical observations can be made as to § 11 (b) (2). Its impact is likewise limited, by reference to the registration requirements, to those holding companies which depend for their very existence upon the constant and systematic use of the mails and the instrumentalities of interstate commerce. Effect is thereby given to the legislative policy set forth in § 1 (c) of interpreting all provisions of the Act to meet the problems and to eliminate the evils "connected with public-utility holding companies which are engaged in interstate commerce or in activities which directly affect or burden interstate commerce."

The Bond and Share system, including American and Electric, possesses an undeniable interstate character which makes it properly subject, from the statutory standpoint, to the provisions of § 11 (b) (2). This vast system embraces utility properties in no fewer than 32 states, from New Jersey to Oregon and from Minnesota to Florida, as well as in 12 foreign countries. Bond and Share dominates and controls this system from its headquarters in New York City.[4] As was the situation in the *North American* case, the proper control and functioning of such an exten-

---

[4] The Commission found that "This control of the subholding companies by Bond and Share is not limited in operation to the mere casting of a certain percentage of votes at stockholders' meetings. It permeates every stratum and unit of the holding company system in the most comprehensive manner. . . . Through the concentrated voting power of the securities owned by Bond and Share, it is able to elect the directors of the subholding companies, and thus govern selection of the respective managements. Through the managements of the subholding companies it is able to govern selection of the directors and managements of each of the operating company subsidiaries of each of the subholding companies. The latter are in turn responsive to Bond and Share's wishes respecting entry into service contracts with Ebasco Services Incorporated, and the details of the operations of their companies." 11 S. E. C. at 1203–04.

sive multi-state network of corporations necessitates continuous and substantial use of the mails and the instrumentalities of interstate commerce. Only in that way can Bond and Share, or its subholding companies or service subsidiary, market and distribute securities, control and influence the various operating companies, negotiate inter-system loans, acquire or exchange property, perform service contracts, or reap the benefits of stock ownership. See § 1(a). See also *International Textbook Co.* v. *Pigg,* 217 U. S. 91. Moreover, many of the operating companies on the lower echelon sell and transmit electric energy or gas in interstate commerce to an extent that cannot be described as spasmodic or insignificant. *Electric Bond & Share Co.* v. *S. E. C., supra,* 432–33.[5] Such activities serve to augment the interstate nature of the Bond and Share system. And they make even plainer the fact that this system falls within the intended scope of § 11 (b) (2).

Congress, of course, has undoubted power under the commerce clause to impose relevant conditions and requirements on those who use the channels of interstate commerce so that those channels will not be conduits for promoting or perpetuating economic evils. *North American Co.* v. *S. E. C., supra; United States* v. *Darby,* 312 U. S. 100; *Brooks* v. *United States,* 267 U. S. 432. Thus to the extent that corporate business is transacted through such channels, affecting commerce in more states than one, Congress may act directly with respect to that business to protect what it conceives to be the national welfare. It

---

[5] The record before this Court in the *Bond and Share* case revealed that more than 31% of the total electric energy generated by Bond and Share subsidiaries is transmitted across state lines, while more than 25% of all the electric energy transmitted across state lines in the United States is handled by Bond and Share companies. Approximately 47% of the gas handled by Bond and Share companies is transported across state lines, this amount constituting more than 20% of all the gas transported across state lines in the United States.

may prescribe appropriate regulations and determine the conditions under which that business may be pursued.[6] It may compel changes in the voting rights and other privileges of stockholders.[7] It may order the divestment or rearrangement of properties.[8] It may order the reorganization or dissolution of corporations.[9] In short, Congress is completely uninhibited by the commerce clause in selecting the means considered necessary for bringing about the desired conditions in the channels of interstate commerce. Any limitations are to be found in other sections of the Constitution. *Gibbons* v. *Ogden,* 9 Wheat. 1, 196.

Since the mandates of § 11 (b) (2) are directed solely to public utility holding company systems that use the channels of interstate commerce, the validity of that section under the commerce clause becomes apparent. It is designed to prevent the use of those channels to propagate and disseminate the evils which had been found to flow from unduly complicated systems and from inequitable distributions of voting power among security holders of the systems. Such evils are so inextricably entwined around the interstate business of the holding company systems as to present no serious question as to the power of Congress under the commerce clause to eradicate them.

In the extensive studies which preceded the passage of the Public Utility Holding Company Act, it had been

---

[6] *United States* v. *Darby,* 312 U. S. 100; *Electric Bond & Share Co.* v. *S. E. C.,* 303 U. S. 419.

[7] *Northern Securities Co.* v. *United States,* 193 U. S. 197; *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106.

[8] *North American Co.* v. *S. E. C.,* 327 U. S. 686.

[9] *Northern Securities Co.* v. *United States, supra; Standard Oil Co.* v. *United States, supra; United States* v. *Reading Co.,* 253 U. S. 26; *United States* v. *Delaware & Hudson Co.,* 213 U. S. 366. See also Breckenridge, "Legal Study on Constitutional Power of Congress to Regulate Stock Ownership in Railroads Engaged in Interstate Commerce," House Report No. 2789, 71st Cong., 3d Sess., Vol. 1, p. 1.

found that "The most distinctive characteristic, and perhaps the most serious defect of the present form of holding-company organization is the pyramided structure which is found in all of the important holding-company groups examined."[10] The pyramiding device in its most common form consisted of interposing one or more subholding companies between the holding company and the operating companies and issuing, at each level of the structure, different classes of stock with unequal voting rights. Most of the financing of the various companies in the structure occurred through the sale to the public of bonds and preferred stock having low fixed returns and generally carrying no voice in the managements. Under such circumstances, a relatively small but strategic investment in common stock (with voting privileges) in the higher levels of a pyramided structure often resulted in absolute control of underlying operating companies with assets of hundreds of millions of dollars.[11] A tremendous "leverage" in rela-

---

[10] Federal Trade Commission Report to the Senate, "Utility Corporations," S. Doc. 92, Part 72–A, 70th Cong., 1st Sess., p. 858. See also Bonbright and Means, The Holding Company (1932), p. 147; Barnes, The Economics of Public Utility Regulation (1942), pp. 71–81, 143–48.

[11] "By the pyramiding of holdings through numerous intermediate holding companies and by the issue, at each level of the structure, of different classes of stock with unequal voting rights, it has frequently been possible for relatively small but powerful groups with a disproportionately small investment of their own to control and to manage solely in their own interest tremendous capital investments of other people's money." Report of the National Power Policy Committee on Public-Utility Holding Companies, H. Doc. 137, 74th Cong., 1st Sess., pp. 4–5.

"The effect of such pyramiding is to multiply greatly the control that can be exercised by the dominant parties through their personal resources. For example, in the illustration just given, an investment of $1 in common stock of Corporation Securities Co. of Chicago would exercise control over about $2,000 invested in properties of some of the operating companies at the bottom of the pyramid. It seems very

102

tion to that stock was thus produced; the earnings of the top holding company were greatly magnified by comparatively small changes in the earnings of the operating companies. The common stock of the top holding company might quickly rise in value and just as quickly fall, making it a natural object for speculation and gambling. In many instances this created financially irresponsible managements and unsound capital structures.[12] Public investors in such stock found themselves the innocent victims, while those who supplied most of the capital through the purchase of bonds and preferred stock likewise suffered in addition to being largely disfranchised. Prudent management of the operating companies became a minor consideration, with pressure being placed on them to sustain the excessive capitalization to the detriment of their service to consumers. Reduction of rates was firmly resisted. The conclusion was accordingly reached by those making the studies that the highly pyramided system "is dangerous and has no justification for existence" [13]

unsafe to have any form of pyramiding which has such a financial basis, not only on account of the excessive concentration of control over immense masses of property but also because of the opportunity it offers to financial adventurers to have too much influence over the general economic interests of the country." Federal Trade Commission Report, *supra*, note 10, p. 161.

[12] The Federal Trade Commission Report, *supra*, note 10, p. 860, found that the highly pyramided holding company system tends to make those few in control at the top "(1) neglect good management of operating companies, especially by failing to provide for adequate depreciation; (2) exaggerate profits by unsound, deceptive accounting; (3) seek exorbitant profits from service fees exacted from subsidiaries; (4) disburse unearned dividends, because the apparent gains, so obtained, greatly magnify the rate of earnings for the top holding company; and (5) promote extravagant speculation in the prices of such equity stocks on the exchanges."

[13] *Ibid.*, p. 162.

and "represents the holding-company system at its worst." [14]

Such was the general nature of the problem to which Congress addressed itself in § 11 (b) (2). Various abuses traceable in substantial measure to the use of the pyramiding device were enumerated in § 1 (b). And it was specifically found in § 1 (b) (3) that the national public interest and the interests of the investors and consumers are or may be adversely affected "when control of such [subsidiary] companies is exerted through disproportionately small investment."

The problem which underlies § 11 (b) (2), therefore, deals with the very essence of holding company systems. Their pyramided structures and the resulting abuses, like their other characteristics, rest squarely upon an extensive use of the mails and the instrumentalities of interstate commerce. Conversely, every interstate transaction of such systems is impregnated in one degree or another with the effects of complicated corporate structures and inequitable distributions of voting power. Many of these effects may be intangible and indistinct, but they are nonetheless real.

To deny that Congress has power to eliminate evils connected with pyramided holding company systems, evils which have been found to be promoted and transmitted by means of interstate commerce, is to deny that Congress can effectively deal with problems concerning the welfare of the national economy. We cannot deny that power. Rather we reaffirm once more the constitutional authority resident in Congress by virtue of the commerce clause to undertake to solve national problems directly and realistically, giving due recognition to the scope of state power. That follows from the fact that

[14] *Ibid.,* p. 860.

the federal commerce power is as broad as the economic needs of the nation. *North American Co.* v. *S. E. C., supra.*

## II.

We likewise reject the claim that § 11 (b) (2) constitutes an unconstitutional delegation of legislative power to the Securities and Exchange Commission because of an alleged absence of any ascertainable standards for guidance in carrying out its functions.

Section 11 (b) (2) itself provides that the Commission shall act so as to ensure that the corporate structure or continued existence of any company in a particular holding company system does not "unduly or unnecessarily complicate the structure" or "unfairly or inequitably distribute voting power among security holders." It is argued that these phrases are undefined by the Act, are legally meaningless in themselves and carry with them no historically defined concepts. As a result, it is said, the Commission is forced to use its unlimited whim to determine compliance or non-compliance with § 11 (b) (2) ; and in framing its orders, the Commission has unfettered discretion to decide whose property shall be taken or destroyed and to what extent. Objection is also made on the score that no standards have been developed or announced by the Commission which justify its action in this case.

These contentions are without merit. Even standing alone, standards in terms of unduly complicated corporate structures and inequitable distributions of voting power cannot be said to be utterly without meaning, especially to those familiar with corporate realities. But these standards need not be tested in isolation. They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear. See *Intermountain Rate Cases,* 234 U. S.

476. From these sources—from the manifold evils revealed by the legislative investigations, the express recital of evils in § 1 (b) of the Act, the general policy declarations of Congress in § 1 (c), the standards for new security issues set forth in § 7, the conditions for acquisitions of properties and securities prescribed in § 10, and the nature of the inquiries contemplated by § 11 (a)—a veritable code of rules reveals itself for the Commission to follow in giving effect to the standards of § 11 (b) (2). These standards are certainly no less definite in nature than those speaking in other contexts in terms of "public interest," "just and reasonable rates," "unfair methods of competition" or "relevant factors." The approval which this Court has given in the past to those standards thus compels the sanctioning of the ones in issue. See *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 24–25; *Yakus* v. *United States,* 321 U. S. 414, 419–27, and cases cited.

The judicial approval accorded these "broad" standards for administrative action is a reflection of the necessities of modern legislation dealing with complex economic and social problems. See *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 398. The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations. Such is the situation here.

Under these circumstances, it is of no constitutional significance that the Commission, in executing the policies of § 11 (b) (2), also has discretion to fashion remedies of a civil nature necessary for attaining the desired goals. See *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. The legislative policies and standards being clear, judicial review of the remedies adopted by the Commission safeguards against statutory or constitutional excesses.

Nor is there any constitutional requirement that the legislative standards be translated by the Commission into formal and detailed rules of thumb prior to their application to a particular case. If that agency wishes to proceed by the more flexible case-by-case method, the Constitution offers no obstacle. All that can be required is that the Commission's actions conform to the statutory language and policy.

## III.

Our decision in *North American Co.* v. *S. E. C., supra,* largely disposes of the objections to § 11 (b) (2) on the basis of the due process clause of the Fifth Amendment.

Section 11 (b) (2), like § 11 (b) (1), materially affects many property interests of holding companies and their investors; it may even destroy whatever right there is to continued corporate existence on the part of a holding company that is found to complicate a system unnecessarily and to serve no useful function. But Congress carefully considered these various interests and found them "outweighed by the political and general economic desirability of breaking up concentrations of financial power in the utility field too big to be effectively regulated in the interest of either the consumer or the investor and too big to permit the functioning of democratic institutions." [15] It is not our function to reweigh these diverse

---

[15] Senate Report No. 621, 74th Cong., 1st Sess., p. 12.

factors or to question the conclusion reached by Congress. Nor can we say that § 11 (b) (2) on its face authorizes or necessarily involves any destruction of any valuable interests without just compensation. The legislative policy and the statutory safeguards pointed out in the *North American* case (pp. 709–710) negative that argument.

Equally groundless is the contention that § 11 (b) (2) is void in the absence of an express provision for notice and opportunity for hearing as to security holders regarding proceedings under that section. The short answer is that such a contention can be raised properly only by a security holder who has suffered injury due to lack of notice or opportunity for hearing. No security holder of that type is now before us. The managements of American and Electric admittedly were notified and participated in the hearings as required by § 11 (b) (2); and they possess no standing to assert the invalidity of that section from the viewpoint of the security holders' constitutional rights to notice and hearing. See *Tyler* v. *Judges of Court of Registration,* 179 U. S. 405, 410; *Hatch* v. *Reardon,* 204 U. S. 152, 160.

However, the Commission in this instance actually gave all security holders of American and Electric public notice of the pendency of the § 11 (b) (2) proceedings and invited them to file applications for intervention before a stated time. This was done pursuant to § 19, which permits the Commission, in accordance with such rules and regulations as it may prescribe, to admit any representative of interested consumers or investors, or any other appropriate person, as a party to any proceeding before that body. These security holders thus received everything which the Constitution could possibly guarantee them in this respect.

That the statute does not expressly insist upon what in fact has been given the security holders is without consti-

tutional relevance under these circumstances. Wherever possible, statutes must be interpreted in accordance with constitutional principles. Here, in the absence of definite contrary indications, it is fair to assume that Congress desired that § 11 (b) (2) be lawfully executed by giving appropriate notice and opportunity for hearing to all those constitutionally entitled thereto. And when that assumption is added to the provisions of § 19, it becomes quite evident that the Commission is bound under the statute to give notice and opportunity for hearing to consumers, investors and other persons whenever constitutionally necessary. See *The Japanese Immigrant Case,* 189 U. S. 86, 100–101.

But should the Commission neglect to follow the necessary procedure in a particular case, such failure would at most justify an objection to the administrative determination rather than to the statute itself. It would then be needless to do more than nullify the action taken in disregard of the constitutional rights to notice and opportunity for hearing. Since we do not have that situation here, however, we need only reiterate that § 11 (b) (2), fairly construed, neither expressly nor impliedly authorizes unconstitutional procedure. It is thus immune to attack on that basis. See *Kentucky Railroad Tax Cases,* 115 U. S. 321; *Bratton v. Chandler,* 260 U. S. 110; *Toombs v. Citizens Bank,* 281 U. S. 643. Cf. *Coe v. Armour Fertilizer Works,* 237 U. S. 413; *Wuchter v. Pizzutti,* 276 U. S. 13.

## IV.

Turning to the Commission's action under § 11 (b) (2) with respect to American and Electric, we find that the record amply supports the finding that their corporate structures and continued existence unduly and unnecessarily complicate the Bond and Share system and unfairly and inequitably distribute voting power among the secu-

rity holders of that system. We need do no more here than state the major facts before the Commission underlying this crucial finding.

Bond and Share organized these two subholding companies under the laws of Maine in 1909 and 1925, respectively. Until 1935, American and Electric had neither offices nor employees; their books were kept by Bond and Share employees in Bond and Share's offices in New York City. Their officers were employed by and paid by Bond and Share. Their subsidiaries were managed in every detail by Bond and Share. And whenever they dealt with their parent they were represented solely by employees and counsel of Bond and Share. Functionally, the Commission found, American and Electric were mere sets of books in Bond and Share's office.

In 1935, shortly before the effective date of the Public Utility Holding Company Act, certain superficial changes were made in the organizational set-up of the Bond and Share system. A separate service subsidiary, Ebasco Services Incorporated, was created to continue functions formerly carried out by the Bond and Share service department. Each of the subholding companies, including American and Electric, was given its own set of officers and employees as well as a separate suite of offices in the Bond and Share office building. Other minor changes took place, but the system in effect continued to operate precisely as it had prior to 1935. Bond and Share still had complete and unquestioned control over American, Electric and their operating subsidiaries.

There is an absence of substantial evidence that either American or Electric is presently able to perform any useful role in the operations of its subsidiaries, such as organizing them into integrated systems or furnishing them with capital or cash. Both companies currently have vast accumulations of unpaid preferred dividends

in arrears, not having been able to meet dividend requirements in the ten years preceding 1941. Instances of past functions relating to subsidiaries reveal either harmful results or the guiding hand of Bond and Share.

The real purpose of American and Electric, as the Commission found, is to act as the leverage and pyramiding device whereby Bond and Share can amass control over vast sums contributed by others and realize for itself large earnings and profits without proportionate investment— the prime evil at which § 11 (b) (2) is directed.

Bond and Share holds 20.7% of the total voting stock of American, this holding having a book value of nearly $10,000,000 or 3.68% of American's total capitalization of $270,000,000. Through this investment, Bond and Share controls not only American but also American's 21 subsidiaries with a total capitalization of $729,000,000. An investment of $10,000,000 thus controls $729,000,000, a ratio of 1 to 73.

Bond and Share also holds 46.8% of Electric's total voting stock; the book equity of this holding amounts to $17,500,000 or 9.14% of Electric's total capitalization of $192,000,000. Bond and Share is thereby enabled to control not only Electric but also Electric's 11 direct and 11 indirect subsidiaries with a total capitalization of $654,000,000. An investment of $17,500,000 thus controls $654,000,000, a ratio of 1 to 37.

The Commission, however, made alternative calculations which gave American and Electric the benefit of a more favorable assumption. It adjusted upward the book figures for Bond and Share's common stock interests in these companies to reflect the amount by which the values on the books of the subsidiaries exceeded corresponding values at which American and Electric carried their stock interest in those subsidiaries. But even after such adjustments, Bond and Share's investment equals only 8.2% of

American's capitalization and only 3.42% of the book values of American's subsidiaries; and its investment in Electric is the equivalent of only 22.25% of Electric's capitalization and 8.72 % of the book values of Electric's subsidiaries.[16]

This disproportion between Bond and Share's investment and the value of the property controlled is even more acute if further adjustments are made to reflect the unconscionable write-ups and inadequate depreciation which the Commission found in the book figures of the various operating companies. American and Electric disagree with many of these adjustments and urge that the book values can be justified; and complaint is made that the Commission refused to consider certain valuation testimony offered by American in this respect. We deem it unnecessary, however, to enter into these disputed matters. Even with the use of the book values, the attenuated investment ratio is such as to justify the Commission's conclusion that Bond and Share's control of the operating companies is achieved "through disproportionately small investment." On that basis, over 96% of the investment in American's subsidiaries is without effective voting representation, while over 91% of the book values of Electric's subsidiaries is similarly disfranchised.[17]

---

[16] Bond and Share's holdings of voting stock of all five of its subholding companies have a stated book value of only $53,337,600, after adjustment for preferred arrearages, which is equal to about 1.85% of the combined consolidated capitalization of the five subholding company systems. This results, after adjustments, in rendering completely ineffectual whatever voting power remains for the securities in the hands of the public investors who have contributed over 80% of the total capitalizations.

[17] We do not understand the Commission to contend that the percentage of voting power and the percentage of investment should necessarily be equal. Its view simply is that no process of weighting could render fair and equitable a distribution of voting power by which Bond and Share controls all of American's subsidiaries by an

Such evidence is more than enough to support the finding that American and Electric are but paper companies without legitimate functional purpose. They serve merely as the mechanism by which Bond and Share maintains a pyramided structure containing the seeds of all the attendant evils condemned by the Act. It was reasonable, therefore, for the Commission to conclude that American and Electric are undue and unnecessary complexities in the Bond and Share system and that their existence unfairly and inequitably distributes voting power among the security holders of the system.

## V.

The major objection raised by American and Electric relates to the Commission's choice of dissolution as "necessary to ensure" that the evils would be corrected and the standards of § 11 (b) (2) effectuated. Emphasis is placed upon alternative plans which are less drastic in nature and which allegedly would meet the statutory standards.

It is a fundamental principle, however, that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy "the relation of remedy to policy is peculiarly a matter for administrative competence." *Phelps Dodge Corp.* v. *Labor Board, supra,* 194. In dealing with the complex problem of adjusting holding company systems in accordance with the legislative standards, the Commission here has accumulated experience and knowledge which no court can hope to attain. Its judgment is entitled to the greatest weight. While recognizing that the Commission's discretion must square with its responsibility, only if the remedy chosen is unwarranted in law

---

investment representing at best 3.42% of their capitalization, or 8.72% in the case of Electric's subsidiaries. See *In re Electric Bond & Share Co.,* 9 S. E. C. 978, 992.

or is without justification in fact should a court attempt to intervene in the matter. Neither ground of intervention is present in this instance.

Dissolution of a holding company or a subholding company plainly is contemplated by § 11 (b) (2) as a possible remedy. It directs the Commission to take such steps as it finds necessary to ensure that "the corporate structure or continued existence of any company in the holding-company system" does not violate the standards set forth. American and Electric argue that the phrase "in the holding-company system" limits the authority of the Commission to orders removing a particular company from the holding company system of which it is a part and does not permit an order terminating its corporate existence. Grammatically, this contention is without merit. The phrase "in the holding-company system" no more modifies "continued existence" than it does "corporate structure." It relates, rather, to the word "company," [18] as though the phrase read "the corporate structure or continued existence of any company which is in the holding-company system."

Such a construction accords with the policy as well as other provisions of the Act. Section 1 (c) declares it to be one of the policies of the Act, in accordance with which all provisions shall be interpreted, "to provide as soon as practicable for the elimination of public-utility holding companies except as otherwise expressly provided in this title." The last sentence of § 11 (b) (2) provides that "Except for the purpose of fairly and equitably distributing voting power among the security holders of such company, nothing in this paragraph shall authorize the Commission to require any change in the corporate structure or existence of any company which is not a holding com-

---

[18] The words "any company in the holding-company system" were substituted for the words "such company" in an earlier draft of § 11 (b) (2). No change in substance was thereby indicated.

pany, . . ." Moreover, §§ 11 (f) and 11 (g) specifically refer to dissolution or plans for dissolution of registered holding companies or their subsidiaries in accordance with § 11.[19] Such statements would be meaningless and unnecessary were dissolution not contemplated as a possible remedy under § 11 (b) (2).

The legislative history supports this interpretation. The original bill which passed the Senate (S. 2796, 74th Cong., 1st Sess.) contained a provision quite similar to the present first sentence of § 11 (b) (2), except that it was mandatory that the Commission require each registered holding company and subsidiary "to be reorganized or dissolved" when the Commission found that it violated the standards of that section. In addition, § 11 (e) as then written permitted a voluntary plan "for the divestment of control, securities, or other assets, or for the reorganization or dissolution, of such company or any subsidiary company." The bill also contained a § 11 (b) (3), providing that within five years all holding companies should cease to be holding companies unless the equivalent of a certificate of convenience and necessity were obtained from the Federal Power Commission. But the House of Representatives insisted upon the elimination of § 11 (b) (3) and the bill finally reported out by the joint conference committee deleted that provision. A further change was made at this time so that § 11 (b) (2), instead of specifying reorganization or dissolution as the remedies, gave the Commission power to require "such steps" as it might find necessary to ensure compliance. Section 11 (e) was also

---

[19] Section 11 (f) refers to fees, expenses and remuneration paid in connection with any reorganization, dissolution, liquidation, bankruptcy or receivership of a registered holding company or a subsidiary thereof. Section 11 (g) speaks of proxies, etc., used "in respect of any plan under this section for the divestment of control, securities, or other assets, or for the dissolution of any registered holding company or any subsidiary company thereof."

changed to permit a voluntary plan "for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof."

Thus the compromise bill which became law omitted the unconditional provision of § 11 (b) (3) for the elimination of all holding companies within five years, substituting therefor the "great-grandfather clause" of § 11 (b) (2), and gave the Commission discretion to determine the necessary steps for compliance instead of specifying reorganization or dissolution. There is nothing to indicate that the framers of the compromise bill meant to forbid reorganization or dissolution as remedies which the Commission might choose. Indeed, the fact that these two remedies had been previously specified is strong evidence that they were in the minds of those who wrote the portion of § 11 (b) (2) now under consideration and that those persons merely wished not to restrict the Commission to those two remedies; they thus gave the Commission discretion to choose whatever remedy it felt necessary. This legislative history, when combined with the various references to dissolution in other parts of § 11, compels the conclusion that dissolution is one of the remedies contemplated by § 11 (b) (2) and that its choice falls within the allowable area of the Commission's discretion.

Nor can we say that the Commission's choice of dissolution with respect to American and Electric is so lacking in reasonableness as to constitute an abuse of its discretion. The Commission chose dissolution because it felt that such action is calculated to correct the situation "most effectively and quickly, ever bearing in mind the stated policy of the Act to provide *as soon as practicable* for the elimination of all holding companies except as expressly provided in the Act." 11 S. E. C. at 1215. It stated that while some measure of amelioration in the statutory offensiveness of American and Electric might be afforded by other approaches, "in our opinion no approach presently avail-

able holds out the promise of effectuating the statute's requirements fully or promptly." *Ibid.*, p. 1215. Cf. *Siegel Co.* v. *Federal Trade Commission,* 327 U. S. 608. That this choice of dissolution in preference to other remedies is not lightly to be disregarded is shown by the statement of Dr. Walter Splawn, much relied upon by Congress in shaping this statute, that "The most effective means of preventing pyramiding is to eliminate the so-called intermediary companies interposed between the operating company and the company at the top." [20]

Without attempting to invade the domain of the Commission's discretion, we can readily perceive a factual basis underlying the choice of dissolution in this instance. The Commission reasonably could conclude from the record that American and Electric perform no justifiable function; they are unnecessary complexities enabling Bond and Share to perpetuate its pyramided system. The actual and potential evils resulting from their continued existence may well be said to outweigh any of their claimed advantages, especially since many of the latter seem impossible of attainment due to the unsound financial structures of the companies. The Commission was thus warranted in feeling that dissolution of these companies is necessary to the attainment of the standards of § 11 (b) (2).

We are unimpressed, moreover, by the claim that dissolution is so drastic a remedy as to be unreasonable. Elimination of useless holding companies may be carried out by fair and equitable methods so as to destroy nothing of real value. American and Electric, the Commission found, are little more than a set of books and a portfolio of securities. And we cannot say that the Commission was without basis for its belief that dissolution under these circumstances

---

[20] Splawn Report, H. Rep. No. 827, 73d Cong., 2d Sess., Pt. 2, p. VII, made pursuant to H. J. Res. 572, 72d Cong., 2d Sess., referred to in § 1 (b) of the Act.

would harm no one. It may well have considered the fact brought out in the argument before us that, so far as Bond and Share and the public security holders are concerned, dissolution would mean little more than the receipt of securities of the operating companies in lieu of their present shares in American and Electric. Any number of benefits might thereafter accrue to these security holders. Their equities in the Bond and Share system would be materially strengthened by the removal of the useless and costly subholding companies and their voting power would tend to be more in proportion to their investment. The financial weaknesses of the various companies remaining in the system would be easier to correct, with numerous benefits to the consumers and the general public as well as the investors.[21]  "In short, the individual investor should receive the kind of a security he thought he was buying in the first place. The actual clearing up, through clean reorganizations, of the tangle in which holding-company finance has left the industry and those who have invested in it, can reestablish a confident, stable market for good utility securities." Senate Report No. 621, 74th Cong., 1st Sess., p. 17. These factors lend substance to the Commission's conclusion that "the dissolution of these companies which not only have never served any useful purpose but have been a medium of much harm, will effectuate the provisions and policies of the Act and will in all respects be

---

[21] "It is thus apparent that though Section 11 is on occasions still referred to as a 'death sentence,' the sophisticated observer no longer regards even the directed reorganization or liquidation of a holding company as a step to be feared by investors. There is increased recognition that these steps in the enforcement of the Act have been 'akin to a surgical operation, through which the dead skin (the top holding company) was being cut away from the pores (the operating companies) in order to allow the latter to breathe.' " Blair-Smith and Helfenstein, "A Death Sentence or a New Lease on Life?" 94 Univ. of Pa. L. Rev. 148, 201.

beneficial to the public interest and the interest of investors and consumers; and we so find." 11 S. E. C. at 1215.

In view of the rational basis for the Commission's choice, the fact that other solutions might have been selected becomes immaterial. The Commission is the body which has the statutory duty of considering the possible solutions and choosing that which it considers most appropriate to the effectuation of the policies of the Act. Our review is limited solely to testing the propriety of the remedy so chosen from the standpoint of the Constitution and the statute. We would be impinging upon the Commission's rightful discretion were we to consider the various alternatives in the hope of finding one that we consider more appropriate. Since the remedy chosen by the Commission in this instance is legally and factually sustainable, it matters not that American and Electric believe that alternative orders should have been entered. It is likewise irrelevant that they feel that Bond and Share is the principal offender against the statutory standards and that the Commission should merely have required Bond and Share to divest itself of its interests in American and Electric. The Commission found that American and Electric violate the statutory standards, a finding that is supportable whatever may be the shortcomings of Bond and Share.

Finally, lengthy objections have been made relative to the Commission's procedure in treating alternative plans filed under § 11 (e) by American and Electric. These plans were designed to adjust the companies to the standards of § 11 (b) (2) without the necessity of dissolution. Motions were made to consolidate the applications for approval of these plans with the proceedings instituted by the Commission under § 11 (b) (2), the hearings then having been in progress for more than a year and the record approaching completion. The Commission deferred consideration of the motions until it entered the § 11 (b) (2)

orders now under review; it then denied the motions and refused to grant hearings on the plans in advance of its orders of dissolution. It did this, however, only after thorough examination of the proposed plans and after finding that they failed to hold out any real promise of effectuating the standards of § 11 (b) (2).

We fail to perceive any error in this procedure. The filing of the § 11 (e) plans, of course, did not oust the Commission of jurisdiction to enter its orders under § 11 (b) (2). That jurisdiction grows out of the statutory command that the Commission declare by order, as soon as practicable, what each holding company system requires by way of integration and simplification. Section 11 (e) merely permits the holding companies to formulate their own programs for compliance with § 11 (b) or to submit plans in conformity with prior Commission orders under § 11 (b), appropriate notice and hearing being contemplated. It does not necessarily give such plans the effect of staying proceedings under § 11 (b) (2) where such proceedings are initiated prior to the filing of the plans. Any other conclusion would permit the filing of dilatory plans so as to render impotent the power and duty of the Commission to enter § 11 (b) (2) orders as soon as practicable.

We assume that the Commission will give due consideration to any plans that are filed under § 11 (e) before it enters a § 11 (b) (2) order. If it finds that such plans may have merit and may effectuate the policies of § 11 (b) (2), the principles of orderly administration would dictate that entry of the § 11 (b) (2) order be deferred until full hearings are had with respect to the plans.[22] It might then

---

[22] With reference to S. 2796, it was said: "Subsection (e) expressly authorizes a holding company subject to the approval of the Commission and the court to work out a plan of reorganization to make unnecessary the issuance of an involuntary order for its reorganization by the Commission, . . ." Senate Report No. 621, 74th Cong., 1st Sess., p. 33.

become apparent that an involuntary order under § 11 (b) (2) would be unnecessary and statutory compliance could be worked out solely under § 11 (e). But where consideration leads the Commission to the conclusion that the plans on their face are incomplete, inadequate and unlikely to satisfy the statutory standards, or where the plans are found to have been filed solely for purposes of delay, it would be contrary to the statutory policy of prompt action to require the Commission to hold hearings on the plans before entering a § 11 (b) (2) order. The Commission then would have no reasonable statutory alternative but to enter the § 11 (b) (2) order as soon as practicable, especially where the unsatisfactory plans are filed long after the institution of the § 11 (b) (2) proceedings. And it is proper for the Commission to make an adverse determination of this nature in regard to the § 11 (e) plans at the time of entry of the § 11 (b) (2) order, such matter lying within the sound discretion of the Commission.

Here the Commission gave due consideration to the § 11 (e) plans and found them to be incomplete and inadequate on their face. It pointed out that seven years had elapsed since the effective date of the Act, four and a half years since the date after which action under § 11 was to be required "as soon as practicable" and more than two years since the present proceedings had been instituted. These factors of time and the lack of substance in the § 11 (e) plans led the Commission to conclude that a delay in the entry of the § 11 (b) (2) orders which it felt necessary to the effectuation of the statutory standards would not be justified. And our examination of the situation reveals an adequate basis in fact for the Commission's action. Note should be made of the fact that the Commission did not refuse by order to hold hearings on the § 11 (e) plans. But to the extent that the entry of the § 11 (b) (2) orders has made the plans moot or the hearings unnecessary, the

result is one that is inevitable if proper accommodation is to be made for the different sections of the Act and for the various statutory policies.

Moreover, a § 11 (b) (2) proceeding leads only to the expression of the Commission's view of what must be done to ensure compliance with the statutory standards. Actual compliance comes later. In the meantime, nothing precludes American or Electric from seeking revocation of the dissolution orders on a showing that the conditions upon which the orders were predicated do not exist, thereby making some other type of order more appropriate. Section 11 (b) expressly envisages such a procedure, with provision for notice and hearing. American and Electric thus are not yet foreclosed from attacking the Commission's orders under § 11 (b) (2).

From what we have said it follows that we must affirm the judgment of the court below and sustain the action of the Commission. The other points that have been raised either do not merit discussion or have been adequately answered in the opinion of the court below.

*Affirmed.*

Mr. Justice Frankfurter agrees with this opinion except that he believes that consideration of the requirements of notice and hearing under § 11 (e) does not arise, in view of the particular circumstances under which the § 11 (b) (2) orders were here made.

Mr. Justice Reed, Mr. Justice Douglas and Mr. Justice Jackson took no part in the consideration or decision of these cases.

Mr. Justice Rutledge, concurring.

I concur in the result and in the Court's opinion, except those portions of Part V dealing with the Commission's procedure in treating the alternative plans filed under § 11 (e) of the Act by American and Electric.

Although, for reasons to be stated, I think the Commission's action in entering its § 11 (b) (2) order must be sustained, I do not think its procedure in respect to making provision for dealing with the alternative plans was in compliance with § 11 (e) or the rights to notice and hearing on such plans which it assured. Because the matter may be of considerable importance for the future, I desire to state my reasons for difference from the views expressed by the Court in this respect.

Section 11 (b) (2) makes it the Commission's duty "as soon as practicable after January 1, 1938," to require by order each registered holding company and each subsidiary thereof, after notice and opportunity for hearing, to take such steps as the Commission shall find necessary to ensure "that the corporate structure or continued existence of any company in the holding-company system does not unduly or unnecessarily complicate the structure, or unfairly or inequitably distribute voting power among security holders, of such holding-company system." 49 Stat. 803, 821. If this section stood alone and unqualified in the Act, the Commission's power would be unquestionable to require the necessary steps to be taken to accomplish the section's stated purposes without reference to voluntary plans submitted by the companies affected.

But § 11 (b) (2) does not stand alone or unqualified in this respect. Section 11 (e)[1] expressly provides for the

---

[1] *"In accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers,* any registered holding company or any subsidiary company of a registered holding company may, at any time after January 1, 1936, submit a plan to the Commission for the divestment of control, securities, or other assets, or for other action by such company or any subsidiary company thereof for the purpose of enabling such company or any subsidiary company thereof to comply with the provisions of subsection (b). *If, after notice and opportunity for hearing, the Commission shall find such plan, as submitted or as modified, necessary to effectuate the*

submission of plans to effectuate the objects of § 11 (b) (2) by "any registered holding company or any subsidiary company of a registered holding company." This is to be done "in accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors or consumers." Moreover, "if, *after notice and opportunity for hearing,* the Commission shall find such plan, *as submitted or as modified,* necessary to effectuate the provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan . . . ." (Emphasis added.)

I do not think that § 11 (e) simply provides a procedure alternative to that of § 11 (b) which the Commission is free to follow or disregard at its pleasure. Both the terms of the Act and the legislative history show that the purpose of § 11 (e) was to allow companies affected "to work out a plan of reorganization to make unnecessary the issuance of an involuntary order for its reorganization . . .," which could only be issued under § 11 (b). S. Rep. No. 621, 74th Cong., 1st Sess., 33; *Commonwealth & Southern Corp.* v. *S. E. C.,* 134 F. 2d 747, 751. In my opinion this purpose, together with the provision for voluntary plans to be submitted "in accordance with such rules and regulations or order as the Commission may deem necessary or appropriate in the public interest or for the protection of investors," [2] assures the right to submit such plans for

_____

*provisions of subsection (b) and fair and equitable to the persons affected by such plan, the Commission shall make an order approving such plan;* and the Commission, at the request of the company, may apply to a court, in accordance with the provisions of subsection (f) of section 18, to enforce and carry out the terms and provisions of such plan. . . ." 49 Stat. 803, 822. (Emphasis added.)

[2] The requirement obviously is not a permission to the Commission to dispense altogether with such rules, regulations or order in its dis-

the Commission's consideration and to have them considered and determined "after notice and opportunity for hearing." See *Chicago Junction Case,* 264 U. S. 258, 264–265.

Furthermore, although the section gives the Commission broad discretion concerning the procedure to be followed, it would seem clear, both from the section's purpose and from its terms, that the Act contemplates that it shall make the required determination, concerning such a voluntary plan properly submitted, prior to the entry of any order under § 11 (b). Cf. *Ashbacker Radio Corp.* v. *F. C. C.,* 326 U. S. 327. Only in this way could the legislative purpose "to make unnecessary issuance of an involuntary order" be made effective. This being true, the section cast upon the Commission the duty of providing the appropriate procedure for submitting voluntary plans, by rules, regulations or order comporting with the specified standards, including those for notice and hearing.

The record does not disclose that the Commission at any time complied with those requirements in these cases. So far as appears no general rules or regulations were issued. Nor was any order made or entered providing for such a procedure. On the contrary, the procedure followed was not, in its initial stages, in accordance with the statutory provisions, as the following chronology demonstrates.

On May 10, 1940, notice of hearing under § 11 (b) (2) was served on the petitioners. The notice made no reference to § 11 (e) or any possible alternative proceedings under it. The hearing was set for June 10, 1940, scarcely time for the petitioners to prepare both a voluntary plan,

---

cretion. It is rather a statutory direction to make them in accordance with the standards prescribed. Any other view would contradict the stated purpose of the section and make of it, in effect, a dead letter.

even if opportunity for filing and hearing were to be afforded, and a defense on the § 11 (b) (2) hearing. Indeed, petitioners recognized that the time was inadequate for preparing their defense, for they applied for postponement of the hearing and other relief.[3]  The Commission postponed the hearing one week, but found no adequate ground for further extension.

The hearing was commenced on June 18, 1940. On July 23, 1941, American submitted its voluntary plan under § 11 (e).  On December 3, 1941, Electric filed its plan. And on December 6, 1941, both companies moved to consolidate their applications with the pending § 11 (b) (2) proceedings.[4]  By agreement of counsel consideration of the motion was delayed for the Commission to pass upon

---

[3] The application stated in part: "It is obvious from the nature of the proceeding . . . that the matters to be dealt with at the hearing are of vital import to the respondents and their subsidiaries, as well as to the hundreds of thousands of investors in securities of companies in the Electric Bond and Share Company system and the millions of consumers presently receiving necessary public utility service from the operating companies in said system.  In the circumstances, respondents believe, first, that they should be given adequate time not only to check and verify the numerous factual allegations contained in the order, but also to develop and correlate for presentation all other facts having a bearing upon the problems and issues presented by the notice and order . . . ."

[4] At the same time American, which previously had filed its plan with the Commission, sought to introduce the plan as an exhibit into the § 11 (b) (2) hearing.  The company's attorney stated, "This plan which has been filed by American Power & Light Company with the Commission sets forth a proposal for the compliance with Section 11 of the Act, and I think that it is material and relevant in this proceeding."  The reply of the trial examiner, sustaining an objection to its admission, apparently typifies the attitude of the Commission toward the requirements of § 11 (e) : "Quite possibly it relates to Section 11; quite possibly it is a matter which the Commission will want to consider before it finally makes up its mind.  It is quite probable. But, nevertheless, we are here restricted to this particular proceeding

at the end of the § 11 (b) (2) hearing⁵ and on July 22, 1942, that hearing was closed as to petitioners by stipulation.

On August 31, 1942, the Commission filed its opinion in support of the orders which are now enforced. In the same opinion it denied the motion to consolidate and also denied petitioners any hearing on their voluntary plans. The motion was denied on the stated ground: "It appears that if consolidation were granted, the result would be to inject into the present proceeding issues of fact and law in many respects different from, and unrelated to, those here involved. In consequence, no useful purpose would be served by permitting the consolidation of the 11 (e) plans with the present proceeding, but on the contrary, delay and confusion would inevitably result." ⁶ Consistently, separate hearing was denied as to the voluntary plans apparently on the grounds that consideration of them would delay the § 11 (b) proceeding, so as to defeat the

and not the power of the Commission or the action of the Commission. The hearing is restricted to 11 (b) (2)."

The Commission at no time before or during the hearing recognized that § 11 (e) plans not only were relevant to whether action should be taken under § 11 (b) (2), but also were required to be considered by hearing before such action is taken. Its view apparently is to the contrary. See *Matter of Electric Bond & Share Co.*, 11 S. E. C. 1146, 1217–1218, quoted in note 7 *infra; Matter of Commonwealth & Southern Corp.*, 11 S. E. C. 138, 154–156. The examiner, of course, could not help himself. The hearing had been limited to § 11 (b) (2). 7 S. E. C. 391.

⁵ The record does not disclose what the agreement was or for what reasons it was made. To delay consideration of the motion to consolidate was in effect to deny it insofar as it sought a joint hearing, though it was always possible for the Commission to order a hearing on the voluntary plans before it issued its § 11 (b) (2) order.

⁶ 11 S. E. C. 1146, 1152. The Commission noted that "these plans were filed at a time when the record in the present proceeding was nearing completion." *Ibid.*

statutory policy of prompt action,[7] and that the plans were incomplete and ineffective.

It is apparent from this recital that the Commission did not at any time comply with the requirement of § 11 (e) that it provide by rules, regulations or order an orderly procedure to carry out the section's command and purpose for the submission and consideration of voluntary plans. And if petitioners had stood upon their rights in this respect, by timely action taken in good faith, the Commission's failure to observe them would have given ground for reversal.

But it is equally obvious that the petitioners did not assert their rights in a manner which invalidates the Com-

---

[7] "With respect to the former point, that of promptness, it need only be considered that it would be necessary for respondents and the Public Utilities Division to formulate and present, and for us to explore, detailed and very extensive evidence on a number of extremely complex subjects *before it would be possible for us to determine even the preliminary question of whether the 11 (e) plans do in fact constitute acceptable alternative courses of action* for achieving the objectives of Section 11. In the event it were necessary to determine the question in the negative, presumably we should be free (even under respondents' contention) to enter our order of dissolution herein following the lengthy delay, unless respondents in the meantime proposed a new 11 (e) plan which would necessitate a repetition of this process. On the other hand, in the event we were ultimately able to approve the plans, they would still not become effective unless and until ratified by vote of the companies' stockholders.

"Considering that 7 years have now gone by since the effective date of the Act, that 4½ years have elapsed since the date after which action under Section 11 was to be required 'as soon as practicable,' and that more than 2 years have been consumed since the present proceeding was instituted, it is evident that respondents' program is too fraught with potentialities of delay to be acceptable as a substitute for a dissolution order to meet the problems existing under Section 11 (b) (2). Section 11 (e) which provides a medium for voluntary compliance with Section 11 (b) was not intended to oust the Commission of its jurisdiction, or relieve it of its obligation, to enforce the provisions of 11 (b)." (Emphasis added.) 11 S. E. C. 1146, 1217–1218. Compare notes 4 and 6, *supra*.

mission's action in entering its § 11 (b) (2) order or made the denial of the motion for hearing reversible error. The petitioners had notice that the Commission would proceed with the § 11 (b) (2) hearing from the time such notice was given in May, 1940. They applied for a continuance. But the record does not disclose that they sought it in order to have time to prepare and submit a voluntary plan or indeed that they took any action toward securing a hearing on such a plan until they submitted their plans. In one case this was more than a year after the § 11 (b) hearing began, in the other nearly a year and a half after that time. When shortly after the latter submission the motions to consolidate were made, consideration was deferred by agreement of counsel until the end of the § 11 (b) (2) hearing; and about seven months later that hearing was closed as to the petitioners by stipulation.

Although in my opinion it was the Commission's duty initially to make provision for notice and hearing on voluntary plans, in accordance with § 11 (e), the petitioners hardly can be considered to have been ignorant either of this duty or of the Commission's failure to perform it. By standing by through the long period of the § 11 (b) proceedings prior to the time of submitting their plans without taking earlier action to secure preservation of their rights to hearing on such plans, the petitioners should be taken to have waived their rights to such hearings. They were not entitled to assert them for the first time at so late a stage in the § 11 (b) proceedings. Nor, in my opinion, is the Commission required to give further consideration to such plans in these cases, unless in its own discretion it sees fit to do so.[8]

---

[8] Cf. § 11 (b): "The Commission may by order revoke or modify any order previously made under this subsection, if, after notice and opportunity for hearing, it finds that the conditions upon which the order was predicated do not exist." 49 Stat. 803, 821.