484 F.2d 339
 AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, GREATER CLEVELAND DISTRICT COUNCIL 78
and Local 100, American Federation of State, County and
Municipal Employees, AFL-CIO, Plaintiffs-Appellees and Cross
Appellants,
v.
CITY OF CLEVELAND and James D. Hodgson, Secretary of Labor,
et al., Defendants-Appellants and Cross Appellees.
 Nos. 73-1106 to 73-1108.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 9, 1973.
Decided Aug. 14, 1973.
 
 Stanton R. Koppel, Dept. of Justice, and Malcolm C. Douglas, Asst. Director of Law, Cleveland, Ohio for defendants-appellants.
 Harlington Wood, Jr., Asst. Atty. Gen., Frederick M. Coleman, U. S. Atty., Walter H. Fleischer, Atty., Dept. of Justice, Washington, D. C., on brief.
 Bernard A. Berkman, Cleveland, Ohio, for plaintiffs-appellees; Larry S. Gordon, Joshua J. Kancelbaum, Cleveland, Ohio, on brief.
 Before PHILLIPS, Chief Judge, and MILLER and LIVELY, Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 This case arose out of a dispute between certain unions which represent employees of the City of Cleveland on the one hand and the Secretary of Labor and the City of Cleveland on the other over the terms of a grant made to the City under the Emergency Employment Act of 1971 (EEA). Cleveland had received two previous grants under the EEA and substantially all of these funds had been used to rehire former employees of the City who had been laid off because of the inability of the City to maintain its full force of workers during a period of severe financial stress. The grant in dispute was made on March 22, 1972 in the amount of $3,400,000. Prior to approving this grant the Secretary of Labor had determined that under the previous two grants Cleveland had rehired the highest percentage of former employees of any program agent in the country. The Director of the Public Employment Program, who was designated by the Secretary to administer the EEA, concluded that the objectives of the Act were not being met by Cleveland. On February 4, 1972 this official wrote the City that it would be a condition of the proposed third grant that not more than fifteen per cent of the grant funds be used to rehire persons employed by the City during the six months immediately preceding the grant application date. On February 25, 1972 the City applied for the third grant with the stipulation included in the application that no more than fifteen per cent of the funds would be thus used.
 
 
 2
 Plaintiffs filed an action on March 27, 1972 seeking a declaratory judgment that the third grant to the City of Cleveland was invalid to the extent that it placed a restriction upon the amount of granted funds which might be used to hire laid-off city employees and an injunction to prevent the City from hiring employees with the grant money except in accordance with seniority rights set forth in certain collective bargaining agreements between the plaintiffs and the City and with the rules of the Cleveland Civil Service Commission. Depositions were taken of responsible officers of the Department of Labor and the City of Cleveland and in addition there were filed a stipulation of facts, several affidavits and a group of exhibits. All parties moved for summary judgment and District Judge Thomas D. Lambros filed a Memorandum Opinion and Order on October 6, 1972. The District Court declared the fifteen per cent restriction to be invalid and enjoined the City of Cleveland from hiring with regard to this restriction. The Court specifically directed that the City accord laid-off workers applying for jobs under the grant the same consideration as other applicants and prohibited it from discriminating against any applicants because of their laid-off status. However, the Court refused to grant the additional relief sought by the unions, that is, a prohibition from hiring any employees under the grant except in accordance with the seniority provisions of the collective bargaining agreements and the regulations of the Cleveland Civil Service Commission. The Court held that it had no independent jurisdiction over this cause of action and could only decide it under its pendent jurisdiction. Finding that the issues involved questions of state law and that it would not be significantly more convenient for the parties to adjudicate them in the District Court, in the exercise of its discretion, the Court declined jurisdiction. All parties have appealed from those portions of the District Court judgment which decided matters adversely to their contentions.
 
 
 3
 The Emergency Employment Act of 1971 appears at Title 42 U.S.C. Secs. 4871-4883. It was a temporary measure designed to meet a particular emergency. Following a statement of findings and declarations, the purpose of the Act was stated by Congress in the following language:
 
 
 4
 It is therefore the purpose of this chapter to provide unemployed and underemployed persons with transitional employment in jobs providing needed public services during times of high unemployment and, wherever feasible, related training and manpower services to enable such persons to move into employment or training not supported under this chapter. 42 U. S.C. Sec. 4871.
 
 
 5
 The Act was to be implemented by agreements between the Secretary of Labor and eligible applicants (typically political subdivisions such as the City of Cleveland) under which financial assistance would be made available to provide transitional employment for unemployed and underemployed persons in jobs providing needed public services. Only "areas of substantial unemployment" were eligible to participate. The Act provides that applications are required before grants may be made and certain provisions are mandated in all applications. In addition to 19 specified provisions required in each application, Sec. 4876(c) provides for-
 
 
 6
 (20) such other assurances, arrangements, and conditions, consistent with the provisions of this chapter, as the Secretary deems necessary, in accordance with such regulations as he shall prescribe.
 
 
 7
 Several provisions of 42 U.S.C. Sec. 4881 are directly involved in this case and are set out below:
 
 
 8
 Sec. 4881 Special provisions-General conditions for financial assistance for programs or activities
 
 
 9
 (a) The Secretary shall not provide financial assistance for any program or activity under this chapter unless he determines, in accordance with such regulations as he shall prescribe, that-
 
 
 10
 (1) the program (A) will result in an increase in employment opportunities over those which would otherwise be available, (B) will not result in the displacement of currently employed workers (including partial displacement such as a reduction in the hours of nonovertime work or wages or employment benefits), (C) will not impair existing contracts for services or result in the substitution of Federal for other funds in connection with work that would otherwise be performed, and (D) will not substitute public service jobs for existing federally assisted jobs;
 
 
 11
 ******
 
 
 12
 * * *
 
 
 13
 (6) the program will, to the maximum extent feasible, contribute to the occupational development or upward mobility of individual participants;
 
 
 14
 ******
 
 
 15
 * * *
 
 
 16
 Equitable basis for public service employment opportunities
 
 
 17
 (b) Consistent with the provisions of this chapter, the Secretary shall make financial assistance under this chapter available in such a manner that, to the extent practicable, public service employment opportunities will be available on an equitable basis in accordance with the purposes of this chapter among significant segments of the population of unemployed persons, giving consideration to the relative numbers of unemployed persons in each such segment.
 
 
 18
 Labor organization opportunity for commentary
 
 
 19
 (c) Where a labor organization represents employees who are engaged in similar work in the same area to that proposed to be performed under any program for which an application is being developed for submission under this chapter, such organization shall be notified and afforded a reasonable period of time in which to make comments to the applicant and to the Secretary.
 
 
 20
 ******
 
 
 21
 * * *
 
 
 22
 General powers of Secretary; payments; installments, advances or reimbursements, adjustments; allocation or expenditure and withholding of funds
 
 
 23
 (e) The Secretary may make such grants, contracts, or agreements, establish such procedures, policies, rules, and regulations, and make such payments, in installments and in advance or by way of reimbursement, or otherwise allocate or expend funds made available under this chapter, as he may deem necessary to carry out the provisions of this chapter, including necessary adjustments in payments on account of overpayments or underpayments. The Secretary may also withhold funds otherwise payable under this chapter in order to recover any amounts expended in the current or immediately prior fiscal year in violation of any provision of this chapter or any term or condition of assistance under this chapter.
 
 
 24
 A fair reading of the entire Act indicates that Congress intended for the Secretary of Labor to exercise rather wide discretion in administration of the program. While certain criteria are set forth in the Act, they tend to be general rather than specific.
 
 
 25
 On their appeal, the unions, which were plaintiffs below, maintain that the fifteen per cent restriction in the grant violates 42 U.S.C. Sec. 4881(a)(1)(C) which prohibits any program under the Act which will impair "existing contracts for services . . . ." It is the position of these appellants that the collective bargaining agreements between them and the City of Cleveland are "contracts for services" which would be impaired by the fifteen per cent limitation. They point out that 42 U.S.C. Sec. 4881(c) provides for commentary by labor organizations, and refer to the "fundamental Congressional policy of encouraging collective bargaining." Primarily, however, these appellants rely upon the decision of the Supreme Court in J. I. Case Co. v. NLRB, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944). On the other hand, the Secretary of Labor and City of Cleveland cite a number of cases for the proposition that a collective bargaining agreement is not a contract for services. They also maintain that to hold that collective bargaining agreements were intended to be protected by Sec. 4881(a)(1)(C) would thwart the overall purpose of the Act which is stated repeatedly as being to provide transitional employment in public service jobs. The same subsection which forbids impairment of contracts for services provides for maintenance of effort by applicants in the requirement that a program not result in the substitution of federal funds for other funds in connection with work that would otherwise be performed. A reading of the two clauses of Sec. 4881(a)(1)(C) together leads logically to the conclusion that the existing contracts for services which may not be impaired are those whose cancellation would result in the substitution of federal funds for local funding through the hiring of employees with grant money to replace work being done under contract.
 
 
 26
 In J. I. Case Co. v. NLRB, supra, the Court held that a collective bargaining agreement is a trade agreement and not a contract of employment. In NLRB v. Wooster Division of Borg-Warner Corp., 236 F.2d 898 (6th Cir. 1956), aff'd in part and rev'd in part, 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958), this Court held that a collective bargaining agreement controls the individual contracts of employment but is not itself a contract of employment. See also International Union, UAW v. Hoosier Cardinal Corp., 235 F.Supp. 183 (S. D.Ind.1964), aff'd 346 F.2d 242 (7th Cir. 1965), aff'd 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). The unions maintain that the decision in J. I. Case v. NLRB, supra, while classifying collective bargaining agreements as trade agreements rather than contracts of employment, has as its true thrust the holding that a collective bargaining agreement is the primary source of all of the terms and conditions of employment and that the employees are third party beneficiaries of such a trade agreement. They maintain that the language in the Act, "contracts for service" includes both individual contracts of employment and the collective bargaining agreements which provide the basic terms of those contracts. Nevertheless, Congress could have very simply and specifically included collective bargaining agreements along with contracts for services in Sec. 4881(a)(1)(C). The failure to do so and the linkage between the provision of non-impairment of contracts for services and the maintenance of effort requirements are persuasive.
 
 
 27
 William Mirengoff, the delegate of the Secretary of Labor directly charged with administration of the Act, testified that the Labor Department construes the term "contracts for service" as referring to private placement, that is, contracts for the purchase of services, which may involve employees. He testified that in a number of programs this language has been construed in this way and it has never been defined as referring to collective bargaining agreements. In Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), it was held that courts must show great deference to the interpretation given a statute by those who are charged with its administration. The Court there held:
 
 
 28
 "The Secretary's interpretation may not be the only one permitted by the language of the orders, but it is quite clearly a reasonable interpretation; courts must therefore respect it." Id., at 4, 85 S.Ct., at 795.
 
 
 29
 Later in the opinion the Court quotes from Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L. Ed.2d 294 (1961), as follows:
 
 
 30
 "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new."' 380 U.S. at 16, 85 S.Ct. at 801.
 
 
 31
 The Emergency Employment Act of 1971 was new legislation for which the Secretary had the responsibility of rapidly assembling and putting into motion a program designed to deal with a temporary situation. The legislative history of the Act, consisting primarily of a Conference Report and Joint Explanatory Statement of the Committee of Conference refers to the provision against impairing existing service contracts without in any way defining the term. We feel that the interpretation given to the language by the Secretary of Labor is reasonable and is more in accord with the purposes of the Act than the interpretation sought by the plaintiffs. The record reveals that some 2,000 former city employees had been laid off by the City of Cleveland at the time the application for the third EEA grant was pending, although it is not clear how many of these were still unemployed. Nevertheless, it is difficult to understand how the stated objective of the Act to provide employment for those groups of persons described as the special concern of Congress in 42 U.S.C. Sec. 4871(1) through (7)[1] would be attained if the hiring to be carried out with these funds were controlled by the seniority and recall provisions of collective bargaining agreements. It was reasonable to conclude that the preference which Congress granted these segments of the population would be thwarted by a requirement that no new hiring could take place until every laid-off employee had been called back in order of seniority. In Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969), the Supreme Court stated that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. . . ." In the present case the compelling indications are that the construction of the statute by the Secretary of Labor was correct and in accord with the Congressional purpose in enacting the Emergency Employment Act of 1971.
 
 
 32
 The depositions revealed that the Secretary of Labor had imposed percentage restrictions on rehiring of former city employees in only two out of some nine hundred grants. Scranton, Pennsylvania had been limited to a 20 or 25 per cent recall of laid-off employees in addition to Cleveland's limitation of fifteen per cent. However, no other program remotely approached the Cleveland record of using 95 per cent of the funds in each of the first two grants to rehire laid-off city workers. In fact, the next largest utilization of funds in this manner, after Cleveland's 95 per cent, was fourteen per cent. It was contemplated by Congress that many localities would rehire regular employees who had been laid off, according to the Joint Explanatory Statement of the Committee on Conference. Conference Report 92-310, 1971 U.S.Code Congr. & Admin.News, pp. 1202, 1203 (92d Cong. 1971). The question presented is whether the fifteen per cent limit was an abuse of discretion when viewed in the light of the purposes of the Act and Cleveland's past practice of using virtually all of its grant funds to put former employees back on its payroll. The witnesses for the Secretary of Labor testified that one of their concerns was that the magnitude of reemployment in Cleveland reflected a substitution of federal funds for local funding of services that would be performed in any event. It was testified that in order to insure "maintenance of effort" the grant funds should be used to create additional positions. On the other hand, the unions assert that with so many city employees laid off, using grant funds to rehire some of these employees only meant that they would perform services that otherwise would not have been performed by anyone because of a lack of local funding. This position was supported by correspondence from the mayor of Cleveland while the application was being prepared. Another concern cited by the Department of Labor witnesses was that the particular groups enumerated in the Act benefit directly from the program.
 
 
 33
 In holding that the Secretary of Labor abused his discretion when he imposed the fifteen per cent limitation on rehiring of former employees the District Court relied primarily upon Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We agree with the District Court that the act of the Secretary imposing the limitation was reviewable under the Administrative Procedure Act, 5 U.S.C. Sec. 701 et seq. As the Court pointed out in Overton Park, supra, a decision of the administrator of a government department or program is entitled to a presumption of regularity, but the standards of review prescribed by 5 U. S.C. Sec. 706 require a substantial inquiry or a "thorough, probing in-depth review" by the reviewing court. Id., at 415, 91 S.Ct. 814.
 
 
 34
 The first inquiry which the Court must make is to determine whether the administrator acted within the scope of his authority. As the Court pointed out in Overton Park the two Congressional acts under which the Secretary of Transportation made the disputed decision narrowly circumscribed his discretion.[2] They contained a prohibition in plain terms against the very action which he approved, unless specified conditions were met. Under these circumstances, in order to uphold the administrative decision, a reviewing court would be required to find that it was reasonable for the administrator to conclude that no feasible alternatives to the proscribed actions existed, or that any alternatives would involve unique problems.
 
 
 35
 The second inquiry of the reviewing court is to determine whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the standard of 5 U.S.C. Sec. 706(2)(A). This inquiry entails a consideration of whether the relevant factors were weighed and whether there has been a "clear error of judgment." This necessarily involves an inquiry into the facts, but the Court must not substitute its judgment for that of the agency. Citizens to Preserve Overton Park v. Volpe, supra at 416, 91 S.Ct. 814.
 
 
 36
 The third and final inquiry by the reviewing court is concerned with whether the necessary procedural requirements were observed by the agency or administrator.
 
 
 37
 Turning to the first inquiry we note a fundamental difference between the EEA and the two acts under which the Secretary of Transportation acted in the Overton Park case. There the Secretary was forbidden by Congress to approve a highway route through a park unless specific conditions were found to exist. No such limitations appear in the Act now under consideration. Rather, a reading of the entire Act leads to the conclusion that Congress granted the Secretary of Labor wide-ranging discretion in applying emergency funds to the alleviation of unemployment. The Secretary made a ruling which is unchallenged here that at least one-third of all grants be used to hire veterans of the Korean and Indochina wars. This was to achieve one of the stated purposes of the Act. The General Powers of the Secretary set forth in Sec. 4881(e), supra, together with the clear grant of discretion with respect to conditions which he might require to be included in applications, contained in Sec. 4876(c)(20), supra, lead us to the conclusion that the Secretary of Labor acted within the scope of his authority in imposing a limitation on the amount of grant money which would be available for the rehiring of former employees. The language of this particular Act seems to invite such discretionary rulings.
 
 
 38
 The second inquiry is more difficult. As the unions point out, the Secretary of Labor had no statistical data on the makeup of the group of former City of Cleveland employees who were not rehired under the first two grants. There is no evidence of how the various groups singled out by Congress for preferential treatment would be represented within this particular segment of unemployed persons. It had been determined, however, that persons recalled under the first two grants included a very low proportion of Vietnam veterans. It was assumed that the characteristics of those on layoff status who had not been rehired would not be significantly different. It was testified that the City had no breakdown by various characteristics mentioned in the Act of its unrecalled former employees. If the unions possessed this information it was not furnished to the City or Secretary nor put in evidence. On the basis of the information available and the stated assumption the Secretary of Labor made a judgment that some standards ought to be imposed upon the City of Cleveland so that it would comply with the provisions of the Act and regulations of the Department of Labor.
 
 
 39
 The District Court found that the fifteen per cent limitation on rehiring was an abuse of discretion in that it violated the provisions of 42 U.S.C. Sec. 4881(b): Equitable basis for public service employment opportunities
 
 
 40
 (b) Consistent with the provisions of this chapter, the Secretary shall make financial assistance under this chapter available in such a manner that, to the extent practicable, public service employment opportunities will be available on an equitable basis in accordance with the purposes of this chapter among significant segments of the population of unemployed persons, giving consideration to the relative numbers of unemployed persons in each such segment.
 
 
 41
 It found that the unemployed persons in the Cleveland area included a great many laid-off city employees and that it would be inequitable to disqualify them for rehiring with EEA funds. The command of Sec. 4881(b) is for the Secretary to use funds provided by the Act to the extent practicable to provide employment opportunities on an equitable basis in accordance with the purposes of the Act. Undeniably, one of the most important purposes of the Act was to provide reemployment for returning servicemen. Each application was required to contain this provision:
 
 
 42
 (4) assurances that special consideration in filling public service jobs will be given to unemployed or underemployed persons who served in the Armed Forces in Indochina or Korea on or after August 5, 1964 in accordance with criteria established by the Secretary (and who have received other than dishonorable discharges); and that the applicant shall (A) make a special effort to acquaint such individuals with the program, and (B) coordinate efforts on behalf of such persons with those authorized by chapter 41 of Title 38 (relating to Job Counseling and Employment Services for Veterans) or carried out by other public or private organizations or agencies; 42 U.S.C. Sec. 4876(c)(4).
 
 
 43
 Yet, the Secretary of Labor had determined that Cleveland had done a very poor job of hiring veterans with the first two grants and concluded that the reason for this poor performance was that Vietnam veterans did not constitute a significant segment of the laid-off employees of the City. By limiting the number of such former employees who could be hired under the third grant, increased opportunity would be provided for hiring veterans.
 
 
 44
 Another purpose of the Act which was emphasized by Congress was that any program financed under it must cause an increase in employment opportunities over those otherwise available and that new jobs not be substituted for existing ones. Sec. 4881(a)(1). Again, the review of Cleveland's use of the first two grants, revealing as it did that virtually all of the money had been used to rehire former employees, convinced the Secretary of Labor that the required increase in employment opportunities had not taken place and the "maintenance of effort" requirements of the Act were not being met. He concluded that a limitation on rehiring former employees would serve to bring the Cleveland program within these qualifying provisions as well.
 
 
 45
 In view of the factual demonstration that the previous use of EEA grants by the City had not produced the results intended by Congress, the Secretary was authorized by Sec. 4876(c)(20) to require such conditions as he might deem necessary for approval of the February 25 application. We do not find the fifteen per cent limitation, under the circumstances revealed in this record, to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). The decision of the Secretary was based on a consideration of the relevant factors and did not constitute a clear error of judgment. To suggest that other methods might have been better employed to achieve the results sought by the limitation is to substitute the judgment of the reviewing court for that of the administrator of the Act. This is not permitted. Citizens to Preserve Overton Park v. Volpe, supra at 416, 91 S.Ct. 814.
 
 
 46
 The third inquiry required of a reviewing court concerns procedural aspects of the administrative decision. Unlike Overton Park, where only affidavits were before the Court, the District Court had for consideration in the present case the 120-page deposition of William Mirengoff, the official charged with administration of the Act, the 112-page deposition of his deputy and the 50-page deposition of the director of personnel of the City of Cleveland. While affidavits which are prepared for a trial may be characterized as "post hoc rationalizations," certainly this is not true of evidence which is procured by adversary examination. There is no indication that the Secretary failed to consider any relevant facts which were available or that the District Court was deprived of the full administrative record upon which the disputed decision was made. There is no requirement that the Secretary make formal findings. The depositions disclosed the facts revealed by review of the earlier grants to the City of Cleveland, the concern prompted by these findings that the purposes of the Act were not being achieved and the reasoning which led to imposition of the fifteen per cent limitation as a remedy.
 
 
 47
 In American Power & Light Co. v. SEC, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946), it was held that the determination of the proper remedy is "peculiarly a matter for administrative competence" where the choice of means of achieving a statutory policy is given to an administrative body. Id., at 112, 67 S.Ct. at 146. The only determination required of a reviewing court where the choice of remedy is entrusted to an administrator is whether, under the pertinent statute and relevant facts, "an allowable judgment" has been made in the choice of the remedy. Butz v. Glover Livestock Commission Co., 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). We believe the record discloses a "rational basis" for the Secretary's decision to limit the use of funds under the grant in question as a means of assuring that the grants to the City of Cleveland would further the purposes of the Act. Udall v. Washington, Virginia and Maryland Coach Co., 130 U.S. App.D.C. 171, 398 F.2d 765, 769 (D.C. Cir. 1968), cert. denied, 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969).
 
 
 48
 We have also been asked to overturn the decision of the District Court declining to adjudicate the claim of the plaintiffs for an injunction against the City of Cleveland. This relief was sought on the basis of collective bargaining agreements between the unions and the City and the regulations of the Cleveland Civil Service Commission. No relief was sought on this claim against the federal defendants and the state law of Ohio would necessarily be controlling. Under these circumstances there was clearly no abuse of discretion in the District Court's declining to exercise its pendent jurisdiction to decide these non-federal questions. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 
 49
 Nos. 73-1106 and 73-1108 are reversed and remanded for entry of judgment for defendants-appellants consistent with this opinion. No. 73-1107 is affirmed.
 
 
 
 [1]
 Sec. 4871. Congressional statement of findings and purposes
 The Congress finds and declares that-
 (1) times of high unemployment severely limit the work opportunities available to the general population, especially low-income persons and migrants, person of limited English-speaking ability, and others from socioeconomic backgrounds generally associated with substantial unemployment and underemployment;
 (2) expanded work opportunities fail, in times of high unemployment, to keep pace with the increased number of persons in the labor force, including the many young persons who are entering the labor force, persons who have recently been separated from military service, and older persons who desire to remain in, enter, or reenter the labor force;
 (3) in times of high unemployment, many low-income persons are unable to secure or retain employment, making it especially difficult to become self-supporting and thus increasing the number of welfare recipients;
 (4) many of the persons who have become unemployed or underemployed as a result of technological changes or as a result of shifts in the pattern of Federal expenditures, as in the defense, aerospace, and construction industries, could usefully be employed in providing needed public services;
 (5) it is appropriate during times of high unemployment to fill unmet needs for public services in such fields as environmental quality, health care, housing and neighborhood improvements, recreation, education, public safety, maintenance of streets, parks, and other public facilities, rural development, transportation, beautification, conservation, crime prevention and control, prison rehabilitation, and other fields of human betterment and public improvement;
 (6) programs providing transitional employment in jobs providing needed public services and related training and manpower services can be a useful component of the Nation's manpower policies in dealing with problems of high unemployment and dependency upon welfare assistance, and providing affected individuals with opportunities to develop skills and abilities to enable them to move into other public or private employment and other opportunities; and
 (7) providing resources for transitional public service employment and related training and manpower services during an economic slowdown can help as an economic stabilizer both to ease the impact of unemployment for the affected individuals and to reduce the pressures which tend to generate further unemployment. (Emphasis added).
 
 
 [2]
 The acts are similar in this respect. One of them, 49 U.S.C. Sec. 1653 provides, in part:
 Maintenance and enhancement of natural beauty of land traversed by transportation lines
 (f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.