749 F.2d 875
 242 U.S.App.D.C. 197, 53 USLW 2327
 ILLINOIS COMMERCE COMMISSION and People of the State of
Illinois, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
National Association of Regulatory Utility Commissioners,
Atchison, Topeka and Santa Fe Railway Company, et
al., Alabama Public Service Company,
Kansas Corporation Commission,
Intervenors.
 No. 83-1120.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 6, 1983.
Decided Dec. 11, 1984.
 
 James E. Weging, Chicago, Ill., for petitioners.
 Charles D. Gray, Washington, D.C., with whom Paul Rodgers and Genevieve Morelli, Washington, D.C., were on the brief, for intervenor National Association of Regulatory Utility Commissioners. Deborah A. Dupont, Washington, D.C., also entered an appearance for intervenor National Association of Regulatory Utility Commissioners.
 John J. McCarthy, Jr., Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, Lawrence H. Richmond, Deputy Associate Gen. Counsel, I.C.C., John J. Powers, III, and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Laurence H. Schecker, Atty., I.C.C., Washington, D.C., also entered an appearance for respondents.
 
 
 1
 Betty Jo Christian, Washington, D.C., with whom Richard E. Weicher, Chicago, Ill., John J. Paylor, Cleveland, Ohio, Howard D. Koontz, Richard J. Schreiber, Chicago, Ill., James L. Howe, III, Richmond, Va., and Steven Reed, Washington, D.C., were on the brief, for intervenors Atchison, Topeka and Santa Fe Railway, et al. Charles N. Marshall, Atlanta, Ga., Hanford O'Hara, Washington, D.C., and Richard W. Kienle, Roanoke, Va., also entered appearances for intervenors Atchison, Topeka and Santa Fe Railway Company, et al.
 
 
 2
 Stanley W. Foy, Montgomery, Ala., was on the brief for intervenor Alabama Public Service Commission.
 
 
 3
 Dennis D. Ahlers, Wichita, Kan., was on the brief for intervenor Kansas Corporation Commission. Donald Low, Topeka, Kan., also entered an appearance for intervenor Kansas Corporation Commission.
 
 
 4
 David R. Richards, Austin, Tex., was on the brief for amicus curiae State of Texas urging reversal.
 
 
 5
 Before TAMM and SCALIA, Circuit Judges, and SWYGERT,* Senior Circuit Judge.
 
 
 6
 Opinion for the court filed by Senior Circuit Judge SWYGERT.
 
 
 7
 Dissenting opinion filed by Circuit Judge SCALIA.
 
 SWYGERT, Senior Circuit Judge:
 
 8
 The Illinois Commerce Commission ("Illinois") petitions for review of a decision of the Interstate Commerce Commission ("ICC"). Ex Parte No. 388 (Jan. 27, 1983), State Intrastate Rail Rate Authority--Pub.L. 96-448, 367 I.C.C. 149. The decision certifies the State commission to regulate intrastate rail transportation provided that Illinois agrees to adopt automatically all ICC-ordered exemptions from the Interstate Commerce Act. Illinois contends that the decision to preempt state jurisdiction over exemption of intrastate railroad rate regulation exceeds the ICC's statutory authority and is contrary to the Staggers Rail Act of 1980 ("the Act"). Illinois further contends that the ICC's modification of Illinois' application for certification violates the commerce clause and the tenth amendment of the Constitution. We affirm the ICC's decision.I
 
 
 9
 The federal government has long regulated intrastate rail traffic on the theory that such traffic is part of an interstate rail network and can sufficiently affect interstate commerce to permit regulation under the commerce clause of the Constitution. See, e.g., Houston, E. & W.T. Ry. v. United States (Shreveport Rate Case), 234 U.S. 342, 350-53, 34 S.Ct. 833, 835-37, 58 L.Ed. 1341 (1914). Because the federal commerce clause power is plenary, see California Bankers Ass'n v. Shultz, 416 U.S. 21, 46, 94 S.Ct. 1494, 1510, 39 L.Ed.2d 812 (1974), Congress can invoke this power to preempt State regulation of intrastate rail traffic. See also Shreveport Rate Case, 234 U.S. at 350-53, 34 S.Ct. at 835-37. Before 1980, Congress empowered the ICC to preempt State regulation only where an intrastate rate set by the State unjustly discriminated against or imposed an undue burden on interstate commerce, or where the State was dilatory in acting upon a proposed intrastate rate change. See 49 U.S.C. Sec. 11501 (Supp. III 1979). In 1980, the ICC's preemptive power was expanded considerably by the Staggers Rail Act, Pub.L. No. 96-448, 94 Stat. 1895 (1980) (codified at 49 U.S.C. Secs. 10101-11917 (1982) ("Staggers Rail Act" or "the Act"). Whether the ICC acted ultra vires or unconstitutionally in its interpretation of its expanded preemptive power is the nub of this appeal.
 
 A. The Staggers Rail Act
 
 10
 The purpose of the Act was "to provide for the restoration, maintenance, and improvement of the physical facilities and financial stability of the rail system of the United States." Id. Sec. 3. Concerned about the "financial plight" of the railroad industry,[1] Congress concluded that overregulation as well as regulation based on antiquated premises had inhibited growth.[2] Therefore, Congress overhauled the federal regulatory scheme[3] and instructed the ICC to exempt rail traffic from any regulation where regulation was "not necessary to carry out the transportation policy" of the Act and where either "(A) the [railway] transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power." Staggers Rail Act Sec. 213 (codified at 49 U.S.C. Sec. 10505(a)).
 
 
 11
 Congress' findings with respect to the harmful effects of federal regulations were equally applicable to State regulation. See, e.g., H.R.Rep. No. 1035, 96th Cong., 2d Sess. 128-30, reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 4072-74. Furthermore, Congress found that the dual system of regulation caused delays in the approval of rate changes, which resulted in losses of approximately $400 million in additional revenues. Id. at 61, 1980 U.S.Code Cong. & Ad.News at 4006. Therefore, in order to "ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices, etc.," the Act "preempt[ed] state authority over rail rates, classifications, rules and practices." H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 106, reprinted in 1980 U.S.Code Cong. & Ad.News 4110, 4138.[4]
 
 
 12
 Having totally preempted State authority, Congress then restored some of it as a matter of legislative grace. But the extent of the State authority was narrowly circumscribed. First, the States had to apply for federal permission to regulate intrastate rail commerce. If the States convinced the ICC that their proposed regulations were "in accordance with the standards and procedures applicable to regulation of rail carriers by the Commission under this title," then the ICC would "certify" the States. Staggers Rail Act Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(3)(A)). Once certified, the States were empowered to regulate intrastate traffic pursuant to the standards and procedures stated in its application. See id. Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(4), (5)).[5] Second, even after certification, the ICC could review, upon petition by a rail carrier, the decision of any State authority for compliance with federal standards and procedures. Id. Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(c)). Third, regardless of any authority granted pursuant to certification, States were absolutely precluded from regulating general rate increases, inflation-based rate increases, and fuel adjustment surcharges.[6]
 
 B. The Certification Proceedings
 
 13
 After the Act's passage in October 1980, Illinois and thirty-nine other States applied for certification. The ICC questioned the extent to which many of the States' proposed regulations complied with federal standards and procedures. Ex Parte No. 388 (April 22, 1981) at 2-4. Nevertheless, in order to comply with the statutory requirement that it act upon a certification request within ninety days of receipt, see 49 U.S.C. Sec. 11501(b)(3)(A), the ICC decided to "provisionally certify" the forty States until June 29, 1981. Ex Parte No. 388 (April 22, 1981) at 7-8. On August 5, 1982, after several extensions of both filing deadlines and provisional certification, the ICC "tentatively" concluded that Illinois' proposed regulations complied with federal standards and procedures. Ex Parte No. 388 (Aug. 5, 1982), 365 I.C.C. 855 (1982).
 
 
 14
 In its proposal for certification, Illinois stated: "An exemption granted for a class of interstate traffic shall not automatically apply in Illinois." Ex Parte No. 388 (Aug. 5, 1982), 365 I.C.C. 855, 856 (quoting Illinois' First Amended General Order No. 219 at 861). Therefore, if the ICC concluded that a certain class of interstate rail traffic should be exempt from regulation, Illinois would not automatically exempt from State regulation the intrastate movement of that same class of traffic. Rather, Illinois would undertake its own independent examination of whether an intrastate exemption was appropriate. In making this determination, Illinois would apply the criteria enumerated in 49 U.S.C. Sec. 10505, which the ICC also applied in granting or denying the federal exemption. In view of this commitment to the federal criteria and the ability of the ICC to review a State exemption decision that differed from the ICC's decision,[7] the ICC stated its intent to certify Illinois unless public comment persuaded it otherwise. Ex Parte No. 388 (Aug. 5, 1982), 365 I.C.C. at 857-58.
 
 
 15
 On September 7, 1982 several railroads operating in Illinois (the "railroads") filed joint comments challenging Illinois' proposed regulations as not in accordance with federal standards and procedures. With respect to exemption procedures, the railroads contended that once the ICC exercised its jurisdiction to exempt traffic from regulation, that decision became a federal standard and procedure from which the States had no authority to deviate. Comments of Railroads Operating in the State of Illinois 17. On January 27, 1983 the ICC adopted the railroads' position and modified the Illinois regulations to require automatic compliance with federal exemptions. Ex Parte No. 388 (Jan. 27, 1983), 367 I.C.C. 149, 152-54. The ICC stressed that because the exemption statute was "such a significant aspect of the Staggers Act, Congress could not have intended the practical problems and inconsistencies that would result from States retaining jurisdiction over classes of traffic exempted nationwide by the Commission." Id. at 153. The ICC noted that if State conditions were sufficiently exceptional to warrant retention of intrastate regulation despite the federal exemption, the ICC could restructure the exemption order accordingly. Id. at 154. Illinois was "unconditionally certified" to regulate intrastate rail traffic pursuant to its proposed regulations as modified by the ICC. Id. at 156.
 
 
 16
 Two members of the Commission dissented, reasoning that Illinois had complied with federal standards and procedures simply by agreeing to apply federal criteria when considering an exemption. The ultimate exemption decision was merely the result of applying those standards and procedures, not a standard or procedure itself. Id. at 154-55 (Simmons, dissenting). Furthermore, there was good reason to have two separate, independent exemption determinations, as "transportation considerations solely within an individual State can be significantly different than those of the Nation as a whole with respect to a particular traffic segment." Id. at 155.
 
 
 17
 Illinois appealed by filing a petition to review the ICC's order on the date it was served. While the ICC modified Illinois' proposed regulations in several respects, Illinois confines its appeal solely to the propriety of the exemption modification. Appellant's Brief at 7. The Alabama Public Service Commission, the Kansas Corporation Commission, and the National Association of Regulatory Utility Commissioners ("NARUC") intervened on behalf of Illinois; the railroads jointly intervened on behalf of the ICC. The State of Texas filed an amicus brief challenging the ICC's order as violative of both federal statute and the Constitution.
 
 II
 
 18
 Although the issue was not briefed by counsel, we note that we have jurisdiction to review the decision below as a "final order" of the ICC. 28 U.S.C. Sec. 2342(5) (1982). In a case arising from the same set of certification proceedings involved in this case, the Eleventh Circuit dismissed for want of jurisdiction an appeal from the ICC order granting Florida "provisional" certification and ordering certain modifications. Florida Public Service Commission v. ICC, 724 F.2d 1460 (11th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 1686, 80 L.Ed.2d 160 (1984). The court reasoned that the ICC had not issued a final appealable order concerning Florida's certification: the order granted only "provisional" certification pending comment and "final certification"; Florida retained jurisdiction to regulate intrastate rates in the interim. Id. at 1462.
 
 
 19
 In the instant proceedings, the ICC indicated that its order was final by "unconditionally" certifying Illinois; the time for considering further amendments or inviting public comment had already passed. The ICC denied Illinois leave to enforce its prior regulations pending further proceedings, but instead, ordered Illinois to modify its regulations to comply with the ICC's decision of January 27. Ex Parte No. 388 (March 4, 1983). Thus, Illinois was faced with the choice of abandoning intrastate regulations altogether or adopting the regulatory scheme approved by the ICC. Unlike the case before the Eleventh Circuit, here the ICC has determined the "rights or obligations" of the parties, "legal consequences will flow from the agency action," and "judicial review will not disrupt the orderly process of adjudication." See Florida Public Service Commission, 724 F.2d at 1462 (quoting Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970)). In sum, the ICC's decision below is a final, appealable order.
 
 III
 
 20
 Illinois argues that the ICC lacked the statutory power to force it to adopt federal exemptions automatically. Adopting the reasoning of the dissent below, Illinois contends that to comply with federal "standards and procedures," it had only to apply the federal criteria governing an exemption decision; the exemption decision was the result of the application of standards and procedures and was not itself a standard or procedure. Because we do not construe the Act in the first instance, we must first define the standard of review of the ICC's construction.
 
 A. Standard of Review
 
 21
 An agency's interpretation of the statute it must administer is ordinarily accorded "great deference." National Wildlife Federation v. Gorsuch, 693 F.2d 156, 166 (D.C.Cir.1982) (quoting EPA v. National Crushed Stone Association, 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980)). "To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." FEC v. Democratic Senatorial Campaign Commission, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Of course, agency constructions that are "inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement" must be overturned as unreasonable. Id. at 32, 102 S.Ct. at 42.
 
 
 22
 Citing National Wildlife, 693 F.2d at 166-70, Illinois contends that this deferential standard should not be applied automatically and that three factors which are present here should persuade us to accord no deference to the ICC: (1) the ICC's construction was not contemporaneous with the statute's enactment, (2) its decision was not unanimous, and (3) its interpretation was inconsistent with prior decisions.
 
 
 23
 It is true that an agency interpretation of the statute it must administer does not in and of itself necessarily justify a deferential standard of review and that the factors listed by Illinois, among others, are also considered in determining the extent of deference owed. See National Wildlife, 693 F.2d at 167 (citing first and third factors listed above); cf. Local 900, Int'l Union of Electrical, Radio and Machine Workers, AFL-CIO v. NLRB, 727 F.2d 1184, 1189 (D.C.Cir.1984) (noting NLRB's unanimity as a factor in court's decision to grant enforcement). But to define the presence or absence of any of these additional factors as dispositive misreads National Wildlife. First, the presence of the first and third factors--contemporaneous and consistency-- heightens deference. National Wildlife, 727 F.2d at 167 & n. 31. If those factors were absent, the court would not be justified in according the agency's decision "no deference," as Illinois urges. Rather, to the extent those factors are absent, the deference generally accorded agency judgment will not be heightened still further. Second, because the general rule is to defer to the reasonable statutory interpretations of agencies, Illinois must show compelling reasons for an exception. We are not persuaded by the argument that we should focus on three factual distinctions from National Wildlife at the exclusion of considering the many other factors enumerated in that case and in the face of our strong predilection for applying the general rule of deference.
 
 
 24
 In any event, Illinois is incorrect in arguing that two of the factors it enumerates are absent in this case. As for the third factor, the ICC's interpretation was not "inconsistent" with its prior decisions. There were no prior decisions with which to be inconsistent. While the ICC had preliminarily concluded that Illinois' exemption procedures were acceptable, that determination was only one facet of a deliberative process, not a final decision of any significance. That the ICC was deliberate enough to test its preliminary conclusions by soliciting public comment and open-minded enough to respond to public comment should be commended, not penalized by according its ultimate judgment less deference. As for the contemporaneousness factor, Illinois ignores that the underlying reason for deferring to agency interpretations contemporaneous with the enactment of a statute is that the interpretation is necessary to set in smooth motion the machinery of a new statute. See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961)). While over two years passed before the agency rendered a final interpretation of the statute governing certification, this was nevertheless the first interpretation, and the certification process was as yet "untried and new." Id.
 
 
 25
 In addition, three other factors in this case militate in favor of great deference. The agency interpretation here was "thorough";[8] Congress intended that the ICC's interpretation be given considerable deference inasmuch as it gave the ICC substantial discretion in administering the certification process and in defining federal "standards and procedures,"[9] and the ICC based its ruling on commercial policy considerations that implicated the agency's expertise.[10] See National Wildlife, 693 F.2d at 167-70 (thoroughness of agency's reasoning, intent of Congress to grant agency substantial discretion in administering a statute, and extent to which agency's interpretation is infused with the agency's expertise are factors justifying great deference). In sum, Illinois has failed to demonstrate any convincing reason to abandon in this case the general rule that an agency's interpretation of the statute it administers must be accorded substantial deference.
 
 
 26
 Intervenor NARUC, however, offers a forceful, but ultimately unpersuasive, alternative reason for not according the ICC's decision substantial deference. Citing North Carolina v. United States, 325 U.S. 507, 511, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760 (1945), NARUC contends that where an agency decision preempts State regulation of intrastate commerce, a strict standard of review is required. "A scrupulous regard for maintaining the power of the state" in the field of intrastate commerce "has caused this Court to require that Interstate Commerce Commission orders giving precedence to federal rates must meet 'a high standard of certainty.' Illinois Central R. Co. v. Public Utilities Commission, 245 U.S. 493, 510 [38 S.Ct. 170, 176, 62 L.Ed. 425] [ (1918) ]." Id. Because the ICC's action preempted the State's traditional regulatory power, "justification for the 'exercise of the federal power must clearly appear.' Florida v. United States, 282 U.S. 194, 211-12 [51 S.Ct. 119, 123-24, 75 L.Ed. 291] [ (1931) ]." Id.
 
 
 27
 NARUC errs in characterizing the North Carolina decision as governing the standard of review of agency decisions. Rather, that decision simply enunciated a well-established rule of statutory construction: the "clear statement" rule. That rule provides that a "court cannot find a federal law preempts state regulation of an activity historically regulated by the states, unless Congress has given a 'clear statement' of its intent to preempt." Texas v. United States, 730 F.2d 339, 347 (5th Cir.1984) (citing Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977)); see generally L. Tribe, American Constitutional Law Sec. 6-25 (1978). Where an agency interprets the statute in the first instance, as is the case both here and in North Carolina, the rule simply requires the agency to determine that "justification for the 'exercise of the Federal [preemptive] power ... clearly appear[s].' " North Carolina, 325 U.S. at 511, 65 S.Ct. at 1263. What standard of review to apply to this determination is an entirely separate question, about which North Carolina is completely silent.[11] We need not decide what that standard of review should be since we find, as the Fifth Circuit did in Texas, 730 F.2d at 347-48, that Congress' intent to preempt State power is unmistakable.[12] 2] The Conference Committee stated that the Act "preempts state authority over rail rates, classifications, rules, and practices." H.R.Conf.Rep. No. 1430, at 106, 1980 U.S.Code Cong. & Ad.News at 4138. This is the kind of "clear statement" that overcomes the rule's presumption that Congress did not intend to assert the full measure of its commerce clause and supremacy clause power to preempt State regulations.[13] We hold that great deference is owed the ICC's decision below. We therefore must affirm the order unless the ICC rendered an unreasonable interpretation of the Act.
 
 
 28
 B. Reasonableness of the Agency's Interpretation
 
 
 29
 The railroads urged the ICC to hold that exemption decisions as well as all other ICC decisions that fix policy are themselves federal standards and procedures that States are bound to apply. Illinois argued that only the criteria used to reach an exemption decision are federal standards and procedures, and, therefore, the States are bound only to apply that criteria in an independent determination of whether to grant an intrastate exemption. The ICC chose a middle course. The ICC reasoned that the Act did not require the States "to follow each Commission regulation and every Commission precedent in all subject matters." Ex Parte No. 388 (Jan. 27, 1983), 367 I.C.C. at 150. The ICC was concerned, however, that the States comply with the underlying policies of the Act. Id. at 151. Because the exemption statute was "such a significant aspect of the Staggers Act," and because continued State regulation would frustrate federal deregulation efforts pursuant to an exemption order, the ICC concluded that an exemption order was a federal standard and procedure that bound the State regulators. Id. at 153. We believe this was a reasonable interpretation of the Act.
 
 
 30
 We need not review the wisdom of refusing to adopt the railroads' broad interpretation of what constitutes binding "standards and procedures." The only issue before us is whether "standards and procedures" should be interpreted broadly enough to include federal exemptions. We note, however, that two circuits have adopted the broad reading urged by the railroads and that their reasoning would a fortiori support our narrower holding with respect to exemptions. See Wheeling-Pittsburgh v. ICC, 723 F.2d 346, 354-55 (3d Cir.1983); Illinois Central Gulf R. Co. v. ICC, 702 F.2d 111, 115 (7th Cir.1983).
 
 
 31
 Deregulation and modernization of the regulations that were retained are the ethos of the Act. Congress found that both overregulation and regulation based on antiquated premises had caused the "financial plight" of the railroad industry.[14] The statutory vehicle for deregulation was the exemption process:
 
 
 32
 The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to instances where regulation is necessary to protect against abuses of market power where other Federal remedies are inadequate for this purpose. Particularly, the conferees expect that as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be removed and that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power.
 
 
 33
 H.R.Conf.Rep. No. 1430 at 105, 1980 U.S.Code Cong. & Ad.News at 4137.
 
 
 34
 Here, the ICC found that retention of State regulations despite a federal exemption would defeat the federal policy of easing regulatory restrictions on the economic behavior of railroads. The ICC recognized that unique State conditions could conceivably justify State regulation despite a federal exemption. But, in the expert judgment of the ICC, such an occurrence would be exceedingly rare and could best be addressed by federal authorities when framing or modifying the federal exemption. See Ex Parte No. 388 (Jan. 27, 1983), 367 I.C.C. at 154.
 
 
 35
 In view of the overriding importance of the exemption provisions, it was reasonable for the ICC to conclude that the statute required States to give immediate and automatic effect to federal exemptions. Congressional findings supported the ICC's judgment that continued regulation by States could subvert a federal effort of deregulation through an exemption. Even if the States eventually granted an exemption, the continued application of State regulations in the interim would tax the railroads' resources. Indeed, Congress found that disparate treatment of railroads by federal and State regulations, in particular the delay in rate increases caused by the intervention of State regulation, had in the past cost the railroads $400 million in additional revenue.[15]
 
 
 36
 Illinois contends that it has a statutory entitlement to render an independent exemption decision. We are unable to discern such an entitlement from either the text or policy of the Act. First, it must be stressed that no State commercial interests are prejudiced by the ICC's decision. The reason that the ICC has jurisdiction to regulate intrastate rail traffic to begin with is that such traffic is part and parcel of a larger system of interstate rail traffic. It is in keeping with the realities of the marketplace to regulate rail traffic as an interstate system; the geographical boundaries of the States in this regard are economically artificial. In considering an exemption, the ICC will give proper heed to intrastate conditions, but in keeping with economic realities it will consider those State conditions as only one facet of a cohesive interstate network. This, in addition to the ICC's willingness to modify exemptions to accommodate special circumstances shown by States,[16] persuades us that no legitimate State commercial interests will be prejudiced.
 
 
 37
 Second, Illinois ignores that it has been preempted from asserting jurisdiction over intrastate rail commerce.[17] To be sure, the House of Representatives rejected an earlier version of the bill that would have completely precluded States from asserting any jurisdiction over intrastate rail rates.[18] Nevertheless, the certification process accords States jurisdiction only as a matter of legislative grace and essentially requires the States to act as regulatory agents of the federal government insofar as they must regulate according to federal standards and procedures.[19] We fail to see how the very limited regulatory role accorded the States justifies an independent State exemption procedure that the ICC has found to frustrate an overriding purpose of the Act: deregulation through the exemption process.
 
 
 38
 Indeed, even if section 214(b) of the Act can be read to confer some entitlement on the part of the States to render an independent exemption decision, we note that the plenary nature of the exemption statute would allow the ICC to exempt railroads from the application of that section--if it made the two necessary findings. Section 213 of the Act allows the ICC to exempt a railroad from the application "of a provision of this subtitle" where that application is (1) not necessary to carry out the transportation policy of the Transportation Title of the U.S. Code and (2) where the rail traffic is of limited scope or where the application of the provision is not necessary to protect shippers from the abuse of market power.[20] The "subtitle" referred to is Subtitle IV, which governs interstate commerce and, of course, includes the certification procedures of section 214.[21]
 
 
 39
 In sum, given the importance of the exemption procedures and the support for the ICC's judgment that the smooth and effective operation of those procedures would be threatened by independent State exemption procedures, we hold that the ICC reasonably interpreted the Act when it found that a federal exemption decision is a federal "standard and procedure" to which States must defer. We do not reach the question, thus far addressed by two circuits,[22] of whether all other ICC decisions and rules should also be considered standards and procedures binding on the States.
 
 IV
 
 40
 Illinois and amicus challenge the constitutionality of the ICC's order requiring Illinois to adopt federal exemptions. Specifically, amicus contends that the federal commerce clause power is not sufficiently broad to permit this preemption of State authority to regulate intrastate trade. Amicus and Illinois both contend that the ICC's order circumscribed State sovereignty in violation of the tenth amendment, as interpreted in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). We find both contentions to be without merit.[23]
 
 
 41
 We agree with the Fifth Circuit that the certification procedures of section 214 of the Act are facially constitutional. Texas, 730 F.2d 339. As for the limits imposed by the commerce clause, it is well-established that Congress may regulate intrastate rail traffic where that traffic substantially affects interstate commerce by virtue of its being part of an interstate rail network. E.g., Shreveport Rate Cases, 234 U.S. at 350-53, 34 S.Ct. at 835-37; cf. Wickard v. Filburn, 317 U.S. 111, 127-28, 63 S.Ct. 82, 90-91, 87 L.Ed. 122 (1942) (purely intrastate activity may be regulated by Congress if the cumulative effect of the activity substantially affects interstate commerce). Courts must uphold legislation where there is any rational basis to support Congress' finding that the regulated activity substantially affects interstate commerce and where there is a reasonable connection between the regulatory means selected and the asserted ends.[24] Texas, 730 F.2d at 348 (citing Hodel v. Indiana, 452 U.S. 314, 323-24, 101 S.Ct. 2376, 2382-83, 69 L.Ed.2d 40 (1981); Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964)). Here, congressional hearings and investigations produced substantial evidence to show (1) the decline of the railroad industry and (2) the comparative overregulation, by State and federal authorities, of that mode of transportation.[25] It was rational for Congress to conclude that there was a causal connection between the two and to prescribe deregulation of intrastate trade as a cure for the substantial negative effect on interstate commerce. The State certification process was a reasonable means to achieve deregulation. By reforming federal standards and procedures and then requiring States to adhere to them, Congress was able to deregulate on both the interstate and intrastate level.
 
 
 42
 As for the tenth amendment challenge, that amendment, and the Usery holding, are not implicated unless the challenged statute regulates "States as States." Texas, 730 F.2d at 353 (citing EEOC v. Wyoming, 460 U.S. 226, 237, 103 S.Ct. 1054, 1061, 75 L.Ed.2d 18 (1983)). Federal legislation that preempts State regulation of private activities, such as railroads, does not regulate "States as States." Id. at 357 (citing Hodel, 452 U.S. at 288, 101 S.Ct. at 2366). Therefore, the tenth amendment is violated only if the State is compelled to administer federal law with respect to the regulated private activity. Id. at 356. Section 214 of the Act does not compel States to adopt federal standards and procedures; States have the option to forego any regulation by refusing to petition for certification. Id. at 357. Congress could have constitutionally preempted all State regulation of intrastate traffic. We fail to see why the Act should become constitutionally flawed simply because Congress chose to allow the States a narrowly-circumscribed regulatory role. Hodel, 452 U.S. at 290, 101 S.Ct. at 2367 (applying precisely the same reasoning to a similar statutory framework governing surface mining).
 
 
 43
 Nor have appellants demonstrated any reason for holding section 214 unconstitutional as applied in this case. As for the commerce clause, it suffices to state that defining exemptions as a federal "standard and procedure" was a reasonable means to facilitate deregulation on the federal and State levels. As for the tenth amendment, we see nothing inherent in the intrastate exemption process that makes its preemption a regulation of "States as States."
 
 V
 
 44
 In sum, we hold that (1) the decision below was a final, appealable order; (2) the decision below must be accorded substantial deference and enforced if it was a reasonable interpretation of the Act; (3) the ICC reasonably interpreted the Act when it found that a federal exemption decision is a "standard and procedure" to which States must defer; (4) the certification procedures of the Act are facially constitutional; and (5) the certification procedures as applied here--specifically the modification of Illinois' proposed regulations to require automatic adoption of federal exemptions--were constitutional.
 
 
 45
 Accordingly, the ICC's order is affirmed.
 
 SCALIA, Circuit Judge, dissenting:
 
 46
 There may or may not be validity to the ICC's judgment, approved by the majority here, that "continued regulation by States could subvert a federal effort of deregulation through an exemption." Maj. op. at 884. I dissent because I think it not the function of the ICC or of this court to assure that the principal goal of a statute is pursued with maximum efficiency, but rather to assure that it is pursued with that degree of efficiency that Congress intended--which may well be less than the maximum, in order to accommodate other interests. The deregulatory provisions of the Staggers Act were a compromise between what is for present purposes maximum efficiency, i.e., total federal preemption, and maximum inefficiency, i.e., continued deferral to traditional state regulation of intrastate carriage. Since the nature of that compromise is best found in the language of the statute; and since that language simply does not bear the meaning the Commission has assigned it; I think today's decision ultimately frustrates rather than furthers the full purpose of the legislation.
 
 
 47
 The majority facilitates its task by describing the legal situation as follows: "Having totally preempted State authority, Congress then restored some of it as a matter of legislative grace." Maj. op. at 878. This notion of total preemption and cede-back has no basis in reality. The Staggers Act provides that "[a] State authority may only exercise jurisdiction ... if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle." 49 U.S.C. Sec. 11501(b)(1) (1982). For those states, like Illinois, that submit their proposed regulatory standards and procedures to the ICC for approval, the referenced provisions permit preexisting state regulation to continue unless and until the Commission determines (through the certification procedures) that the state's standards and procedures are not in accordance with the standards and procedures applicable to interstate regulation. 49 U.S.C. Sec. 11501(b)(2) & (3). This is no total preemption, but merely a limitation upon preexisting, traditional, unpreempted state powers--or, if you will, a partial preemption, the scope of which is precisely the question before us. This is the view we recently took in Utah Power & Light Co. v. ICC, 747 F.2d 721, 726 (D.C.Cir.1984) ("Congress expressly rejected a sweeping federal preemption of the state regulatory role"). It is also the view of the Third Circuit:
 
 
 48
 Contrary to the ICC's contention, the legislative history of the Staggers Act indicates that the Act did not fundamentally reallocate federal and state ratemaking authority.... Rather, it appears that Congress, by rejecting federal preemption of intrastate rates, intended to preserve this traditional sphere of state competence.
 
 
 49
 Wheeling-Pittsburgh Steel Corp. v. ICC, 723 F.2d 346, 353 (3d Cir.1983). The majority's only basis for its hypothesis of total preemption is a statement in the Conference Report that "the Act preempts state authority over rail rates, classifications, rules and practices," H.R. REP. NO. 1430, 96th Cong., 2d Sess. 106 (1980), 1980 U.S.Code Cong. & Ad.News p. 4111-4112. I would agree it preempts: the question is how far --totally or only in part? Nothing suggests the former. In short, from both a technical and a practical point of view, what is at issue here is not the scope of a supposed federal cede-back, but the scope of a partial federal preemption.
 
 
 50
 There is no doubt concerning the manner in which we are to resolve this issue:
 
 
 51
 Where ... the field which Congress is said to have pre-empted has been traditionally occupied by the States, see, e.g., U.S. Const., Art. I, Sec. 10; Patapsco Guano Co. v. North Carolina, 171 U.S. 345, 358 [18 S.Ct. 862, 867, 43 L.Ed. 191] (1898), "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). This assumption provides assurance that "the federal-state balance," United States v. Bass, 404 U.S. 336, 349 [92 S.Ct. 515, 523, 30 L.Ed.2d 488] (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts. But when Congress has "unmistakably ... ordained," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248] (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall.
 
 
 52
 Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). To depart from that long tradition of interpretation in the present case is particularly inappropriate, because the language at issue was specifically adopted as a compromise between pro- and anti-preemption legislators, who must be presumed to have evaluated the deal with that tradition in mind.
 
 
 53
 It is worth briefly describing the compromise, since the basic issue here is whether it will be enforced or disregarded. The original House version of the Staggers Act (H.R. 7235, 96th Cong., 2d Sess. (1980)) flatly ousted the states from all jurisdiction over intrastate rates. See 126 CONG.REC. 17,793 (1980) (colloquy prepared by Rep. Madigan). Rep. Broyhill, however, introduced an amendment prompted by "great concern expressed by the public utility commission in my State and in others" about the elimination of state jurisdiction. Id. at 18,298. The amendment sought to "achieve a better balance between Federal regulation and State regulation," id., by permitting states to continue to exercise jurisdiction over intrastate rates if they applied the rate regulation standards set forth in the Staggers Act and if their proposed regulatory procedures were approved by the ICC as consistent with its own procedures. Rep. Broyhill's amendment was accepted by the majority of the House Committee on Interstate and Foreign Commerce which first reported H.R. 7235, id.; with minor alteration, its intent to preserve state jurisdiction was carried forward to the final House bill, see H.R.REP. NO. 1430, 96th Cong., 2d Sess. 105-06 (1980), 1980 U.S.Code Cong. & Ad.News p. 4111-4112, the Conference Committee Report, id. at 106, and, as a perusal of 49 U.S.C. Sec. 11501(b)-(c) will confirm, the bill that was ultimately signed into law.
 
 
 54
 It is, as I have suggested, a betrayal of that compromise to interpret its language on a basis different from that traditionally employed--which presumes the absence of preemption unless it clearly appears. In my view, however, the majority opinion not only fails to apply such a presumption but reaches a result that is wrong even without it. The crucial language, the nub of the accommodation between the federal and state proponents, is the following:
 
 
 55
 [E]ach State authority exercising jurisdiction over intrastate rates, classifications, rules, and practices for intrastate transportation ... shall submit to the Commission the standards and procedures (including timing requirements) used by such State authority in exercising such jurisdiction.... [T]he Commission shall certify such State authority for purposes of this subsection if the Commission determines that such standards and procedures are in accordance with the standards and procedures applicable to regulation of rail carriers by the Commission under this title.... Any rail carrier ... may petition the Commission to review the decision of any State authority, in any administrative proceeding in which the lawfulness of an intrastate rate, classification, rule, or practice is determined, on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of this subtitle.... If the Commission determines that the standards and procedures were not in accordance with the provisions of this subtitle, its order shall determine and authorize the carrier to establish the appropriate rate, classification, rule, or practice.
 
 
 56
 49 U.S.C. Sec. 11501(b)(2), (b)(3)(A), (c) (emphasis added). This text establishes a dichotomy between the state authority's "standards and procedures," on the one hand--which must conform to those of the Commission--and the carrier "rates, classifications, rules, and practices" approved by the state authority, on the other hand--which need not accord with those approved for interstate carriers by the Commission. The question before us is whether a Commission class-of-traffic exemption--that is, a Commission determination under 49 U.S.C. Sec. 10505 that a particular category of interstate traffic (such as boxcar or export coal traffic) shall be exempt from one or more provisions of the Act (e.g., rate regulation)--constitutes a "standard or procedure" of the Commission. It seems to me obvious that it does not. The whole nature of the dichotomy is that the one element (standards and procedures) is used in order to determine the other element (the validity of carrier rates, classifications, rules and practices). A Commission exemption--an exemption from rate regulation, for example--is in no sense a standard by which the validity of a rate is determined, but is rather the determination itself, in effect approving all rates for the subject commodity. There will have to be an adjudication, of course, to determine whether a particular shipment comes within the exemption--but the mere existence of some generality in a determination is not alone enough to make it a standard, since the same is obviously true of the carrier "rules" and "classifications" that the Commission approves, which fall on the other side of the dichotomy.
 
 
 57
 What is meant by a standard is a principle of general application regarding degree of competition, revenue adequacy, service needs or other elements of the national transportation policy which will, when applied to particular facts, determine the legitimacy of railroad behavior. Prototypical examples are the "formulas or procedures" for determining variable costs and the "standards and procedures for establishing [adequate] revenue levels" that the Commission is required to adopt. See 49 U.S.C. Secs. 10701a(c)(4)(A), 10704(a)(2). To confuse such a standard with an exemption is to call a criterion a conclusion or a test an outcome. Rather than constituting standards, exemptions--in effect automatic approvals of particular carrier activities--are the consequence of the application of standards to the activities in question. The broadest of those standards are set forth in Sec. 10505 itself, which requires the Commission to grant an exemption when the provision in question
 
 
 58
 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
 
 
 59
 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.
 
 
 60
 49 U.S.C. Sec. 10505(a). Subordinate standards further specifying these broad statutory generalities can of course be developed by the Commission. And both the statutory and Commission-developed standards must be applied by the states in their determinations of whether, at the intrastate level, the traffic should be exempt. But the exemption itself is, under no conceivable meaning of the term, a standard.
 
 
 61
 Though the answer seems to me clear in the present case, I do not pretend that it will always be easy to identify a standard within the meaning of the statutory provisions here at issue. But assuredly that judgment must be made by conducting an inquiry along the lines I have just described, rather than by simply asking, as the Commission and the majority did here: "Will it hamper federal deregulation for the states to fall out of lock-step with regard to this federal determination?"--or actually, even less than that: "Will it hamper federal deregulation to have to assure the necessary degree of lock-step by reviewing state adjudications instead of flatly prescribing a uniform intrastate rule?" An affirmative response to that question proves nothing except that the proponents of deregulation were wise in seeking total federal preemption. But they were also unsuccessful.
 
 
 62
 The majority appeals to the deference we owe to the Commission's judgment. I agree with the proposition, Maj. op. at 881, that we always owe the agency's judgment some deference--even an agency judgment such as this one, reached by a 4-to-2 margin (with the Chairman in dissent) and reversing the agency's initial view of the matter. The only question is whether the deference owed in this case is sufficiently "heightened" to permit such mayhem upon the mother tongue as to call an exemption a standard. The only "heightening" factor discussed in the majority opinion that I think substantial is the fact that "the ICC based its ruling on commercial policy considerations that implicated the agency's expertise," Maj. op. at 881 - 882 (footnote omitted). It is true that the agency based its interpretation upon the judgment (which it is much more informed than we are to make) that the failure of a state to apply a federal exemption in lock-step would create "practical problems and inconsistencies," would cause "operational and/or marketing difficulties," and would interfere "with the railroads' and shippers' freedom to take advantage of permitted flexibility in doing business under the Staggers Act." State Intrastate Rail Rate Authority, Ex Parte No. 388, 367 I.C.C. 149, 153 (1983). If these horribles were envisioned by the Commission with regard to a statutory scheme presumably designed to avoid them, its selection of an interpretation that would, in its expert judgment, achieve that desired result would be persuasive. The problem here is that the presumption is not justified. It is entirely clear that the continuation of state regulation provided in the Staggers Act will complicate rail operations and impede deregulation; that is why the proponents of the original version of the legislation sought to eliminate it. The whole purpose of the provisions at issue here was to establish in what manner, and thus to what degree, it would complicate and impede. The majority has it precisely backwards, it seems to me, when--in reliance upon the Commission's expertise--it in effect applies a standard of "no major complication or impedence" to reach a conclusion regarding the meaning of the statutory text. It is the text that is the standard, and the degree of complication or impedence that is the conclusion.
 
 
 63
 That is why, for certain areas in which the statutory text would produce a conclusion of more complication or impedence than Congress was willing to accept, the text was suspended and total federal preemption imposed. 49 U.S.C. Sec. 11501(b)(6) provides that "[n]otwithstanding any other provision of this subtitle, a State authority may not exercise any jurisdiction over general rate increases under section 10706 of this title, inflation-based rate increases under section 10712 of this title, or fuel adjustment surcharges approved by the Commission." It would have been simple to add to this catalogue "exemptions of classes of traffic under section 10505 of this title." That was not done. If it was unnecessary, then one must wonder why it was necessary to list "inflation-based rate increases under section 10712." Surely those increases, justified solely by reference to objectively determinable "inflationary cost increases," 49 U.S.C. Sec. 10712(a) (1982), would meet the same test of ipso facto exclusion from state jurisdiction that the Commission applied here: "it is difficult to conceive of a situation where a State should continue regulation ... where the Commission, based on its own record, and under the same statutory criteria to be used by the States, has already determined that an exemption is warranted." 367 I.C.C. at 153.
 
 
 64
 The railroads argued before the Commission that all ICC decisions on all subjects are "standards and procedures" under Sec. 11501(b). The majority claims that "two circuits have adopted [this] broad reading ... and ... their reasoning would a fortiori support our narrower holding with respect to exemptions." Maj. op. at 883, citing Wheeling-Pittsburgh Steel Corp. v. ICC, supra, and Illinois Central Gulf R.R. v. ICC, 702 F.2d 111, 115 (7th Cir.1983). I disagree with the characterization of both these cases. To begin with, they both dealt only with the scope of the ICC's power to review state adjudicatory determinations under Sec. 11501(c). I agree that that is plenary--so that if the ICC is indeed correct that the standards it applied in reaching the conclusion of a class-of-traffic exemption for interstate purposes will inevitably produce the same class-of-traffic exemption for intrastate purposes, it will inevitably reverse every state determination to the contrary. But we will be able to review that asserted inevitability on the basis of the evidence presented in the particular cases, instead of accepting as a statutory prescription that any exemption valid for interstate traffic applies to intrastate traffic as well. Neither Wheeling-Pittsburgh Steel nor Illinois Central holds that, outside the context of a specific adjudication, the ICC can dictate the application as well as the interpretation of the federal standards used by the state commissions in their intrastate proceedings.
 
 
 65
 Moreover, even the language of Wheeling-Pittsburgh Steel does not support the interpretation suggested by the majority. It does not intimate, much less state, that all Commission conclusions with regard to interstate traffic must be followed with regard to intrastate traffic. To the contrary, it displays a clear awareness that only pronouncements establishing "standards and procedures" have that effect (a condition that was easily met in the case before it, which involved Commission guidelines concerning the manner of computing revenue adequacy and maximum allowable rates). This is clear from the court's statement of its principal holding:
 
 
 66
 We hold that the phrase "standards and procedures" in section 11501(c) refers to standards and procedures promulgated and interpreted in decisions and orders of the ICC as well as those standards or procedures expressly incorporated in the Interstate Commerce Act.
 
 
 67
 723 F.2d at 354-55.
 
 
 68
 The language of Illinois Central (as opposed to its holding) is another matter. It does indeed say that "a discrete reading of the statute requires that consistent rulings of the ICC must necessarily be incorporated and adhered to by state commissions exercising jurisdiction pursuant to the Staggers Act." 702 F.2d at 115. Though the interpretation is not inevitable, I find it difficult to contest the majority opinion's assertion that this was meant to cover all rulings of the ICC--inasmuch as the author of Illinois Central and the author of the majority opinion are one and the same. It seems to me, however, that the dictum rests upon a misapprehension of the statute's basic dichotomy between "standards and procedures" on the one hand and "rates, classifications, rules and practices" on the other. That is apparent from the Illinois Central court's description of the question it thought it had before it:
 
 
 69
 The crux of the dispute we must resolve is whether the policy of the ICC to enforce average agreements can be considered a "rule" or "practice" under the Act, thereby requiring conformity by a state railroad commission exercising its authority under the Act.
 
 
 70
 702 F.2d at 115. Of course the real question was whether the state authority was departing from ICC standards in declining to enforce an average agreement--which would automatically be the case if the ICC's approval of such agreements was itself a standard, but could also be the case if it was not but the standards that produced it would yield the same result in the state case. In no event, however, could the ICC policy be a "rule" or "practice" under the Act, since those terms refer not to the decisions, rules or practices of the ICC, but to the rules or practices of the carriers. And even if they did refer to the former, one would think they would represent the opposite of the ICC "standards and procedures" the states are bound to apply. In other words, the formulation of the issue before the court would be mildly mistaken if it had used the terms "standard and procedure" instead of "rule or practice," but is incomprehensible as written. The penultimate sentence of the opinion reinforces the impression that the language of the statute had not much to do with the outcome:
 
 
 71
 Thus, whether the ICC's insistence in honoring average agreements is considered a "standard," "procedure," or "practice," it should have been applied by the Kentucky Commission.
 
 
 72
 702 F.2d at 116 (footnote omitted). I therefore do not consider the Illinois Central dictum a reliable guide.
 
 
 73
 As a supplemental argument, the majority asserts that the same exemption provision of the Act that would be used to establish the class-of-traffic exemptions at issue here could also be used to exempt railroads from the provision of the Act that establishes continuing state jurisdiction over them. Maj. op. at 885. The problem with this analysis (apart from the fact that it makes a shambles of the legislative compromise) is that the exemption provision only applies "[i]n a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter," 49 U.S.C. Sec. 10505(a). I interpret this to mean that the matter must relate not merely to the carrier, but also to the transportation in question. Cf. 49 U.S.C. Sec. 10501(a) ("Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation --(1) by rail carrier ....") (emphasis added). But intrastate transportation is excluded from the jurisdiction of the Commission, see 49 U.S.C. Sec. 10501(b)(1), unless the Commission acquires jurisdiction by proper refusal to certify a state regulatory authority under Sec. 11501. See 49 U.S.C. Sec. 11501(b)(4)(B). Thus, this imaginative make-weight in the majority's analysis ultimately comes up against the same obstacle that impedes its principal argument: the necessity of establishing that certification was properly denied, the only asserted basis for which is the proposition that a class-of-traffic exemption is a standard.
 
 
 74
 * * *
 
 
 75
 * * *
 
 
 76
 It is my impression that, in the long era of expanding economic regulation that preceded the current trend towards disengagement, zealous regulators more than once turned a legislative compromise into an unqualified victory by successfully urging that the limiting text of a statute be interpreted in light of its "broad remedial purposes"--as though there had been only one side in the Congress, or as though prescribed limitations were less important than the prescribed powers which they circumscribed. It may seem to many that turnabout is fair play.
 
 
 77
 Ultimately, however, the integrity of the process is of supreme importance. Legislative compromise (which is to say most intelligent legislation) becomes impossible when there is no assurance that the statutory words in which it is contained will be honored. Those members of Congress who unsuccessfully oppose a legislative initiative favored by the Executive have every reason to fear that any ambiguity they leave in the statute will be interpreted against their interests by the implementing agency. But they also have every reason to trust that the clear limitations they succeed in imposing will be faithfully observed. Those are the rules of the game, and I think they have been violated here. I respectfully dissent.
 
 
 
 *
 Of the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. Sec. 291(a)
 
 
 [1]
 See H.R.Rep. No. 1035, 96th Cong., 2d Sess. 34, reprinted in 1980 U.S.Code Cong & Ad.News 3978, 3979. This financial plight was manifested by an anticipated capital shortfall of between sixteen and twenty billion dollars by 1985 and a poor rate of return on equity when compared to other major modes of transportation. Id. at 34-36, 1980 U.S.Code Cong. & Ad.News at 3979-81
 
 
 [2]
 Congress found that while regulation had been essential to prevent the abuse of monopoly by railroads earlier in the century, the competition provided by the rise of other modes of transportation rendered the old regulatory framework antiquated and inefficient. See Staggers Rail Act Secs. 2(1)-(5). Indeed, a "significant reason" for the decline of the industry was the "inflexibility" of the existing regulation. See H.R.Rep. No. 1035 at 38, 1980 U.S.Code Cong. & Ad.News at 3983. Furthermore, regulation, however enlightened, itself adversely affected the ability of railroads to compete with substantially unregulated or deregulated modes of transportation. See id. at 115, 1980 U.S.Code Cong. & Ad.News at 4059
 
 
 [3]
 Finding a need for the "modernization of economic regulation of the railroad industry," Staggers Rail Act Sec. 2(9), Congress gave the railroads substantially more freedom to set rates. Specifically, the ICC was given jurisdiction to review the reasonableness of rates only where a rail carrier had market dominance and the rate exceeded the applicable revenue-variable cost percentage threshold. See id. Secs. 201-09; H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 79-80, reprinted in 1980 U.S.Code Cong. & Ad.News, 4110, 4111-12. In addition, the new regulatory framework "affirmatively encourage[d] railroads to use new marketing practices by permitting contracts between carriers and shippers; permissive limited liability rates; business entertainment expenses; efficient marketing through faster implementation of rates; and premium charges to encourage better car utilization," H.R.Conf.Rep. No. 1430 at 80, 1980 U.S.Code Cong. & Ad.News at 4111-12, and provided for new accounting and reporting systems, see Staggers Rail Act Secs. 301-03
 
 
 [4]
 The Act preempted State regulation of intrastate rail commerce by stating:
 A State authority may only exercise jurisdiction over intrastate transportation provided by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title if such State authority exercises such jurisdiction exclusively in accordance with the provisions of this subtitle.
 Staggers Rail Act Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(1)). To the extent that the ICC does not have jurisdiction to begin with--e.g., to the extent that the relevant aspect of intrastate commerce does not cause sufficient interstate effects to be deemed "interstate commerce" within the meaning of the commerce clause--the State does, of course, have plenary power to regulate.
 
 
 [5]
 A denial of certification vested the ICC with plenary jurisdiction to regulate the intrastate commerce of the uncertified State. See Staggers Rail Act Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(4)). Once certified, a State could not change its certified standards and procedures without the express permission of the ICC. Id. Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(5)(B))
 
 
 [6]
 Notwithstanding any other provision of this subtitle, a State authority may not exercise any jurisdiction over general rate increases under section 10706 of this title, inflation-based rate increases under section 10712 of this title, or fuel adjustment surcharges approved by the Commission." Id. at Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(6)). Cf. Indianapolis Power & Light Co. v. ICC, 687 F.2d 1098, 1100 n. 2 (7th Cir.1982) (interpreting meaning of "general rate increases")
 
 
 [7]
 Presumably, a rail carrier aggrieved by the State's exemption decision would invoke the ICC's jurisdiction by petitioning the ICC to review that decision "on the grounds that the standards and procedures applied by the State were not in accordance with the provisions of this subtitle," pursuant to 49 U.S.C. Sec. 11501(c)
 
 
 [8]
 As in National Wildlife, 693 F.2d at 168-69, we find nothing in the record to show that the agency's decisionmaking process has been inadequate in this instance. The ICC's deliberative process began with a determination that the State's proposals required more specificity. When Illinois resubmitted its proposal, the ICC tentatively approved it pending public comment. After reviewing the comments of the railroads, the ICC rendered a final decision that analyzed both the language and policies behind the statute
 
 
 [9]
 The Act provides:
 ... [T]he Commission shall certify such State authority for the purposes of this subsection if the Commission determines that such standards and procedures are in accordance with the standards and procedures applicable to regulation of rail carriers by the Commission under this title. If the Commission determines that such standards and procedures are not in such accordance, it shall deny certification to such State authority, and such State authority may resubmit new standards and procedures to the Commission for review in accordance with this subsection.
 Staggers Rail Act Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(3)(A)). Such a broad delegation of power to the ICC to interpret the standards and procedures required by Title 49 of the U.S. Code indicates that Congress intended the ICC's interpretation of that title to be accorded substantial deference.
 
 
 [10]
 The underlying reason for deference to agency interpretations is that agencies possess special expertise. Where the agency's interpretation is based on its scientific expertise or its unique ability to assess the policies with which it must grapple on a day-to-day basis, then the interpretation manifests an expertise to which courts must defer; where the interpretation rests not on policy considerations but on a narrow dissection of statutory language, the courts are equally skilled in making such an interpretation, and reduced deference is owed. National Wildlife, 693 F.2d at 169-70
 Here the ICC based its decision on policy considerations: "Based upon the goals of the Staggers Act, the rail transportation policy, and serious practical considerations, we conclude that, once a particular category of traffic is exempted by the Commission, this becomes a standard from which States cannot deviate...." Ex Parte No. 388 (Jan. 27, 1983), 367 I.C.C. at 152. Because this conclusion required the agency to exercise its expert knowledge of commercial policy, an area in which the agency possesses a comparative advantage vis-a-vis the courts, this court should accord substantial deference to the agency's interpretation.
 
 
 [11]
 We therefore disagree with the Third Circuit's suggestion that North Carolina, 325 U.S. at 511, 65 S.Ct. at 1263, requires that ICC orders preempting State regulatory power be subjected to a more rigorous standard of review. Wheeling-Pittsburgh Steel Corp. v. ICC, 723 F.2d 346, 351 (3d Cir.1983). But see infra note 12 (an argument can be made, on grounds unrelated to those expressed in Wheeling-Pittsburgh, that a rigorous standard of review should be applied to agency findings with regard to the clear statement rule)
 
 
 [12]
 Where the reviewing court would reach the same conclusion as the agency reviewed had the court been able to decide the issue in the first instance, the standard of review issue is moot. The standard of review is in essence a measure of the willingness of courts, for a variety of institutional reasons, to defer to the resolution of issues it may have decided differently in the first instance. In the instant case, we agree that Congress clearly stated its preemptive intent, and therefore there is no reason to assess the extent to which we would be willing to affirm an agency decision we disagreed with
 We note, however, that in National Wildlife, 693 F.2d at 170, we stated that "deference is not a unitary concept, to be applied with equal force to all issues in a case." Given the comparative competence of the court to assess preemptive intent, it is possible that the "clear statement" issue should be reviewed with less deference than other issues in the case.
 
 
 [13]
 The clear statement rule simply requires the agency to presume that Congress intended no preemption. See L. Tribe, supra, at Sec. 6-25. That presumption is easily rebutted where Congress expressly states that it intends preemption
 It is true that Congress did return some regulatory power to States that could persuade the ICC to certify their regulations as in compliance with federal standards and procedures. There is no reason to reapply the clear statement rule to the ICC's certification decisions. There can be no question that Congress clearly intended to preempt State authority subject to the ICC's decision, in the exercise of its sound discretion, to certify State standards and procedures. See supra notes 4-6 and accompanying text. We agree with the Third Circuit's suggestion, however, that the ICC should clearly state its reasons for denying certification. See Wheeling-Pittsburgh, 723 F.2d at 353.
 
 
 [14]
 See supra notes 1-4 and accompanying text
 
 
 [15]
 See supra text accompanying notes 3-4
 
 
 [16]
 The ICC noted that if State conditions were exceptional enough to warrant retention of intrastate regulations despite the federal exemption, the ICC could restructure the exemption order accordingly. Ex Parte No. 388 (Jan. 27, 1983), 367 I.C.C. at 154. The ICC further stated that it would entertain State petitions to so modify exemptions. Id
 
 
 [17]
 See supra notes 4-6 and accompanying text
 
 
 [18]
 See H.R. 7235, 96th Cong., 2d Sess. Sec. 210, 126 Cong.Rec. 18287 (1980). In order to "achieve a better balance between Federal regulation and State regulation," Congressman Broyhill offered an amendment substantially similar to the certification provisions eventually enacted. See 126 Cong.Rec. 18298 (1980). The balance struck by Congress, however, accorded the States a distinctly junior role in the regulatory scheme. See infra note 19 and accompanying text
 
 
 [19]
 See supra notes 4-6 and accompanying text
 
 
 [20]
 Staggers Rail Act Sec. 213 (codified at 49 U.S.C. Sec. 10505)
 
 
 [21]
 Congress intended that exemption authority would be invoked frequently and would be applied to a broad range of statutory regulations. See supra text accompanying notes 14-15. Congressman Staggers stressed the breadth and importance of the exemption provisions:
 The exemption authority has been carefully drafted to limit regulation to the bare essentials necessary to protect against abuses of market power. It is the intent of the conference committee that this standard would permit the exemption of any provision in the act, except as specified in the exemption section.
 
 
 [126]
 Cong.Rec. 28431 (1980) (remarks of Rep. Staggers) (emphasis added). Therefore, exemption authority is sufficiently plenary to allow the ICC to exempt railroads from the application of certification authority itself
 Of course, one of the findings necessary to support such an exemption is that the provision is "not necessary to carry out the transportation policy" of the Act. Staggers Rail Act Sec. 213 (codified at 49 U.S.C. Sec. 10505(a)(1)). One of the policies of the Act is to "cooperate with the States on transportation matters." Id. at Sec. 101(a) (codified at 49 U.S.C. Sec. 10101a(9)). Therefore, in exempting State certification authority, the ICC would have to balance this policy goal against the many other policy goals of the Act--e.g., "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." Id. at section 101(a) (codified at 49 U.S.C. Sec. 10101a(1)). Inasmuch as cooperation with the States is not subverted by exempting just one aspect of regulation--exemption hearings--the ICC could probably legitimately conclude that other policy goals of the Act are controlling.
 
 
 [22]
 See Wheeling-Pittsburgh, 723 F.2d at 354-55; Illinois Central Gulf R. Co., 702 F.2d at 115
 
 
 [23]
 In distinguishing between the constitutional prerogatives of the ICC and Congress, Illinois appears to raise a third constitutional issue: that of overbroad delegation. See Appellant's Reply Brief at 9-10. The delegation of authority to the ICC to determine whether State agencies complied with federal standards and procedures was not the kind of "standardless" delegation of power proscribed by principles of separation of powers. See, e.g., American Power & Light Co. v. SEC, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946). Congress expressly stated that federal standards and procedures must be defined in accordance with the provisions of the transportation title of the U.S. Code. See Staggers Rail Act Sec. 214(b) (codified at 49 U.S.C. Sec. 11501(b)(3)(A) ("the Commission shall certify [States] ... if [it] ... determines that [the proposed] ... standards and procedures are in accordance with the standards and procedures applicable to regulation of rail carriers by the Commission under this title"). We believe the intricacies of the text and policy of the transportation code provide adequately intelligible standards to guide the ICC in its exercise of delegated power
 
 
 [24]
 Illinois contends that the rational basis test applies only to Congress, not to agencies. Appellant's Reply Brief at 9. Illinois is correct only insofar as it suggests that agencies require "express or implied authorization from Congress." Id. But this is a statutory issue that we have already decided. Having concluded that the ICC acted in accordance with the statute, the question then becomes whether Congress had a rational basis for authorizing the ICC's action. In short, Illinois confuses the statutory issue with the constitutional one
 
 
 [25]
 See supra notes 1-6 and accompanying text. Accord Texas, 730 F.2d at 349